In re B.C. ROGERS POULTRY, INC.,
B.C. Rogers Processors, Inc.,
Jointly Administered.

John M. Rogers, Sr., and J. Kelley
Williams, as Trustee of the J. Kelley
Williams Revocable Trust, Plaintiffs

v.

The CIT Group/Equipment Financing,
Inc., and H. Kenneth Lefoldt, as Liq-
uidating Trustee of the B.C. Rogers
Liquidating Trust, Defendants.

Bankruptcy No. 01–06516–EE.
Adversary No. 03–00122–EE.

United States Bankruptcy Court,
S.D. Mississippi.

Aug. 19, 2011.

528

James W. O'Mara, Debra M. Brown, Phelps Dunbar LLP, Jackson, MS, for Plaintiffs.

William H. Leech, Danny E. Ruhl, Copeland, Cook, Taylor & Bush, P.A., Ridgeland, MS, for Defendant The CIT Group/Equipment Financing, Inc.

J. Walter Newman, IV, Jackson, MS, for Defendant H. Kenneth Lefoldt, Jr., as Liquidating Trustee of the B.C. Rogers Liquidating Trust.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE SECOND AMENDED COMPLAINT

EDWARD ELLINGTON, Bankruptcy Judge.

## TABLE OF CONTENTS

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE *SECOND AMENDED COMPLAINT* .................................................530

FINDINGS OF FACT .......................................................531

TWO PRELIMINARY OBSERVATIONS .........................................548

JURISDICTION ...........................................................548

CONCLUSIONS OF LAW .....................................................548

A. Misrepresentation ...................................................548
 1. Intentional or Fraudulent Misrepresentation ....................549
 a. Did McClelland's Note Constitute a Misrepresentation of Fact? ............549
 b. Did McClelland Owe Rogers and Williams a Duty to Disclose the Heller Lease? .......................................................550
 c. When Did McClelland Actually Know About the Double–Leased Equipment? ....................................................552
 d. Did McClelland Intend for Rogers and Williams to Rely on the Note to Induce Them to Provide the Letters of Credit? ........................554
 e. When Did Rogers and Williams Actually Know About the Double–Leased Equipment? .................................................555
 f. Did Rogers and Williams Reasonably Rely on McClelland's Note? ..........555
 2. Negligent Misrepresentation ....................................558
 a. When Should McClelland Have Known About the Double–Leased Equipment? .....................................................558
 b. Do the UCC Filings, Which Are Public Records, Render Rogers' and Williams' Reliance Unreasonable? ...................................558

B. Civil Conspiracy .....................................................559
 1. What Object Did CIT and Koch Accomplish? ......................560

 2. Was There a Meeting of the Minds Between CIT and Koch? ...................560
 3. What Was the Unlawful Overt Act? .......................................561

C. Breach of the CIT Lease ............................................562
 1. Does the Independence Principle Bar Rogers and Williams from Asserting
 Subrogation Rights Against CIT? ......................................562
 2. Does the Doctrine of Equitable Subrogation Apply? .........................565
 3. Does the "Made–Whole" Rule of Subrogation Apply? ........................566
 4. Would Equitable Subrogation Prejudice Third Parties? ......................567

D. Unjust Enrichment ................................................569
 1. Are Rogers' and Williams' Unjust Enrichment Claims Precluded by the
 Existence of Express Contracts? .......................................569
 2. Does Unjust Enrichment Constitute a Separate Cause of Action Under
 Mississippi Law? ...................................................569
 3. Was CIT Unjustly Enriched? .........................................570

CONCLUSION ........................................................571

This adversary proceeding came on for trial on April 15–16 and 19–20, 2010 (the "Trial") on the *Second Amended Complaint* (Adv. Dkt. No. 63)[1] filed by John M. Rogers, Sr. ("Rogers") and J. Kelley Williams ("Williams"), as Trustee of the J. Kelley Williams Revocable Trust, and the *Answer and Defenses of The CIT Group/Equipment Financing, Inc. to Second Amended Complaint* ("CIT Answer") (Adv. Dkt. No. 71) filed by The CIT Group/Equipment Financing, Inc. ("CIT").

This proceeding is the latest in a continuing saga that began after B.C. Rogers Poultry, Inc. and B.C. Rogers Processors, Inc. ("BCR") defaulted on lease payments on certain industrial equipment used in its plants. CIT turned to the financial institutions that issued standby letters of credit supporting the lease and demanded payment of $3,000,000.00. The issuers paid CIT and turned to the applicants of the letters of credit, Rogers and Williams, for reimbursement. Rogers and Williams reimbursed the issuers and turned to BCR, but were unsuccessful. Rogers and Williams now turn to CIT, the beneficiary of the letters of credit, for the return of $3,000,000.00, damages, interest, and attorney's fees.

After considering the evidence presented at Trial and the briefs filed by the parties, the Court concludes for the reasons that follow that the relief sought by Rogers and Williams against CIT in the *Second Amended Complaint* is not well taken and should be denied.

## FINDINGS OF FACT

Only a decade before it met its financial demise in 2001, BCR was one of the largest producers, processors, and wholesalers of chicken products in the nation. It was founded in central Mississippi in the early 1930s by B.C. Rogers. When he died in 1972, ownership of BCR passed to his three children. Of them, Rogers became chief executive officer ("CEO") of BCR and a member of its board of directors. BCR remained a family-owned company until 1981, when Rogers and Williams purchased all of BCR's stock from the heirs of B.C. Rogers (including from Rogers himself) and each acquired a 50% interest. As was the case with Rogers, Williams was an

**1.** Citations to the record are as follows: (1) citations to docket entries in this Adversary, Case No. 03–00122–EE, are cited as "(Adv. Dkt. No. ____)" and (2) citations to docket entries in the main bankruptcy case, Case No. 01–06516–EE, are cited as "(Dkt. No. ____)".

experienced businessman. Sometime in the early 1970s, he became CEO of First Mississippi Corporation (which later changed its name to Chemfirst). Williams also has an impressive educational background, including a degree in chemical engineering from Georgia Institute of Technology and a master's degree in business administration from Harvard Business School. When they purchased BCR, Rogers continued in his dual roles as both CEO and director, and Williams became one of BCR's board members. In 1997, Rogers resigned as CEO, but Rogers and Williams remained as directors.

### Rogers & Williams Sell BCR

On December 29, 1999, the year before the poultry industry experienced an economic downturn, Rogers and Williams, and their respective family trusts,[2] sold BCR for approximately $50,000,000.00 to two Employee Stock Ownership Trusts (the "ESOTs") in a leveraged buyout transaction. (CIT-4).[3] The sale involved a series of complex, related transactions that all became effective on December 29, 1999, at which time, the newly-formed ESOTs became the owners of BCR.

### Revolving Credit & Term Loan Agreement

Concurrent with the stock sale, BCR entered into an Amended and Restated Revolving Credit and Term Loan Agreement ("Revolving Credit and Term Loan Agreement") with Suntrust Bank, certain John Hancock entities, and other lenders (collectively referred to as the "Senior Lenders"). (CIT-2). Pursuant to the Revolving Credit and Term Loan Agreement, BCR borrowed an aggregate principal amount of $95,000,000.00 from the Senior Lenders who obtained a primary lien on all of BCR's assets, including after-acquired assets. This new financing arrangement modified BCR's original credit facility and was necessary in order to restructure BCR's existing debt, increase its working capital, and raise enough funds for the ESOTs to pay Rogers and Williams $25,000,000.00, the cash portion of the total ESOT purchase price. (CIT-2, CIT-4). In addition to the cash payment, BCR provided Rogers and Williams promissory notes in the amount of approximately $25,000,000.00, under which both of them were entitled to receive quarterly cash payments, representing accrued interest ("Quarterly Interest Payments"). Rogers and Williams expressly agreed to subordinate BCR's promissory notes to them to the debt BCR owed the Senior Lenders. (CIT-7, CIT-8). These promissory notes are hereinafter referred to as "Subordinated Debt." In order to secure payment of the Subordinated Debt, the ESOTs pledged certain shares of BCR stock to Rogers and Williams.

### BCR's Financial Troubles

In his Trial testimony, Williams aptly described the poultry business as cyclical in nature. Unfortunately, the poultry industry spun downward in 2000, the same time that BCR used its line of credit to purchase equipment for a new poultry manufacturing process. The purchase was intended to improve BCR's profit margins,

---

**2.** The two family trusts are the John M. Rogers Ten Trust and the J. Kelley Williams Ten Trust, both formed in 1990. For the sake of brevity and because the role of the trusts makes no difference to the issues before the Court, the Court will not refer to them again.

**3.** The trial exhibits of Rogers and Williams are cited as "(P-____)", and the trial exhibits of CIT are cited as "(CIT-____)". Page numbers for the trial exhibits refer either to the original page number of the document itself or, for those exhibits where page numbers are included, to that page number. Many of the trial exhibits are redundant, and citations do not always refer to every exhibit where a document may be found.

but the cost of the new line of equipment, including a "batter bread line," caused it to encounter financial troubles from which it never recovered.

### Re–Negotiation of the Revolving Credit and Term Loan Agreement

In the summer of 2000, the Senior Lenders approached BCR, Rogers, and Williams to raise their concerns about BCR's liquidity position and its total capital expenditures as of the end of BCR's fiscal year. (CIT–10). The Senior Lenders claimed that BCR was in breach of certain covenants in the Revolving Credit and Term Loan Agreement and had improperly paid Rogers and Williams Quarterly Interest Payments on May 1, 2000. BCR, Rogers, and Williams disagreed with the Senior Lenders in all respects except one. They agreed that BCR was in urgent need of additional cash. Consequently, the Senior Lenders began re-negotiating the terms of the Revolving Credit and Term Loan Agreement with BCR, Rogers, and Williams. Although Rogers and Williams were not parties to that contract, they had an interest in its successful re-negotiation because (1) the Senior Lenders were pressuring them to return a substantial amount of the cash the ESOTs had paid them and accept in exchange a corresponding increase in BCR's Subordinated Debt, (2) they had a substantial amount of Subordinated Debt already at risk, and (3) they would lose their Quarterly Interest Payments in the event BCR defaulted. By this time, Williams had retained William S. Painter ("Painter") to represent him in the re-negotiations.[4] Later, Painter enlisted the assistance of his law partner, David E. Fielder ("Fielder"). Both Painter and Fielder testified at Trial regarding these negotiations.

The Senior Lenders proposed a refinancing plan that required BCR to reduce its capital inventory and limit its capital expenditures. Of relevance to this proceeding, the Senior Lenders proposed that BCR "obtain a minimum of $4,000,000 in sale/leaseback financing ... on equipment previously purchased and deemed by the Senior Lenders as acceptable to be released" from their primary lien on BCR's assets. (CIT–11). The Senior Lenders also required BCR to obtain at least $4,400,000.00 in bridge financing (the "Bridge Facility") to be secured by a lien behind the primary lien of the Senior Lenders. (CIT–11). The proceeds from these two proposed transactions would then be applied to reduce the amount BCR owed the Senior Lenders under the Revolving Credit and Term Loan Agreement.

### The Sale/Leaseback Transaction

BCR contacted CIT and other financial institutions to determine their interest in providing the necessary financing for the sale/leaseback transaction (the "Sale/Leaseback Transaction"). These efforts on behalf of BCR were spear-headed by Tito Echiburu ("Echiburu"), chief financial officer of BCR, and Willis Lucroy[5] ("Lucroy"), financial director of BCR. BCR had entered into similar lease-financing arrangements on many prior occasions using equipment it already owned. BCR's purpose in doing so in the past was similar to its present purpose-to obtain cash to comply with its lenders' demands. As former owners of BCR, Rogers and Williams were aware that this was a common practice.

---

4. Rogers did not retain separate counsel. As is discussed later in this opinion, Rogers authorized Williams to represent his interests in these re-negotiations and agreed to pay one-half of Williams' attorney's fees and expenses.

5. Lucroy died in 1997, before Trial.

Dennis M. McClelland ("McClelland"), district manager of CIT, had previously negotiated a sale/leaseback transaction with BCR while employed by another company. McClelland and Sukru Ahmet Beyhan ("Beyhan"), a CIT credit underwriter, toured BCR's plants during the summer of 2000 to acquire financial information about BCR to determine CIT's interest in financing the arrangement. McClelland and Beyhan were the main CIT employees involved in the Sale/Leaseback Transaction leading up to its consummation.

McClelland was aware that the Sale/Leaseback Transaction was a component of a larger refinancing plan required by BCR's Senior Lenders with a goal of generating $4,000,000.00 in cash. He was also aware from his discussions with some of the Senior Lenders that BCR was struggling financially at this time. (P–9, P–134B). Indeed, Echiburu testified at Trial that he viewed the funds generated by the Sale/Leaseback Transaction as money already spent by BCR.

On August 17, 2000, after CIT had expressed an interest in moving forward with the Sale/Leaseback Transaction, Lucroy prepared a list of proposed equipment (the "Equipment") to sell to CIT. (P–1; CIT–12). BCR had purchased the Equipment during the previous two years from various vendors, but not from CIT. The Equipment was located in BCR's plant in Morton, Mississippi, and its two processing plants in Forest, Mississippi, but most of it was located in the Morton plant. Some of the Equipment consisted of a "batter bread line" that BCR had recently purchased.

For each item of Equipment listed, Lucroy created a column that included a brief description of the item, the date of its original acquisition, the name of the vendor from whom it was acquired, and its original cost to BCR. (CIT–12). The "cost" column at the end of the list reflected a price for all of the Equipment—when it was originally purchased—of $4,038,696.17, which was close to the amount of the sale/leaseback financing required by the Senior Lenders. Lucroy forwarded the list to CIT to use in connection with the Sale/Leaseback Transaction. Later, it became known that BCR had already leased from another lessor some of the items that Lucroy had included in the list. There was no evidence at Trial that suggested that Lucroy, or anyone else at BCR, intended to double lease any items of equipment.

### The 2000 Loeb Appraisal

In connection with Lucroy's discussions with McClelland, Echiburu engaged James L. Newman, CEA, ASA, CSA [6] ("Newman"), president of Loeb Equipment and Appraisal Company ("Loeb") on October 3, 2000, to inspect and appraise the Equipment listed by Lucroy. (P–7, at 8–16). The terms of the appraisal engagement letter required Loeb to include in its final appraisal report three different valuations for the Equipment: (1) the public auction/forced liquidation sale value ("PAV"); [7]

---

**6.** Newman is a Certified Equipment Appraiser by the Association of Machinery and Equipment Appraisers, a Senior Machinery and Equipment Appraiser of the American Society of Appraisers, and a Certified Senior Appraiser of the Equipment Appraisers Association of North America. (P–7, at 15). Newman is not related to J. Walter Newman, IV, counsel for the defendant, H. Kenneth Lefoldt, Jr.

**7.** "PAV" is defined as the estimated gross income of a well prepared and properly advertised sale conducted on the premises with all bids being made on an "as is" and "where is" basis. (P–7).

(2) the orderly liquidation value ("OLV"); [8] and (3) the fair market value-for removal ("FMV").[9] Also, pursuant to the terms of the engagement letter, BCR asked Newman to send two copies of the report to CIT. (P–7, at 13). Although BCR engaged Newman, his engagement was made with CIT's approval, and CIT guaranteed payment of Loeb's appraisal fee. (P–125).

On October 5 and October 6, 2000, a Loeb employee, escorted by two BCR employees, performed a physical inspection of the Equipment. On October 20, 2000, Loeb forwarded a list of the Equipment it had inspected and appraised to Lucroy and asked him to "review[ ] this list to make sure we did not miss any major items(s)." (P–88; CIT–14). A handwritten note dated October 23, 2000, in Loeb's file states, "[I] talked to Mr. Willis Lucroy of BC Rogers Processing and he says the list is okay." (P–88). Newman testified at Trial that it was standard practice for Loeb to require verification of any list of equipment it produced before releasing any appraisal report.

On October 24, 2000, Loeb completed its report (the "2000 Loeb Appraisal"), and Newman forwarded it to Lucroy and sent copies to CIT. (P–7; CIT–136). Loeb used three different valuations, as requested by BCR, and determined that the value of all of the Equipment as of October 24, 2000, was as follows:

| PAV | OLV | FMV–For Removal |
|---|---|---|
| $1,681,100.00 | $2,289,600.00 | $2,914,500.00 |

The total value of the Equipment under any one of the three valuations was substantially *less* than the $4,000,000.00 sought by BCR in the Sale/Leaseback Transaction.

### The Equipment List

In a list attached to the end of the 2000 Loeb Appraisal (the "Equipment List"), which was based on Lucroy's list, each item of Equipment was assigned an "Appraisal Item Number" from 001 through 169. For each such item, there were seven columns, four of them indicated a different monetary value for that same item. In addition to the three values mentioned in the 2000 Loeb Appraisal itself (PAV, OLV, and FMV), the Equipment List included a fourth column indicating the price "per invoice shown Loeb on invoices during inspection." The "new price" value for all of the Equipment—$4,168,799.00—was listed on the last page alongside the totals of the three other valuations. (P–7, at 42). The total value of the Equipment under the "new price" was slightly *more* than the $4,000,000.00 sought by BCR in the Sale/Leaseback Transaction. At Trial, Newman could not specifically recall why the "new price" column was included in the Equipment List, even though it was not mentioned in the 2000 Loeb Appraisal.

### CIT's Financing Proposal

In a letter to Lucroy from McClelland dated November 8, 2000, CIT proposed the terms of a $4,000,000.00 sale/leaseback financing arrangement that would require BCR to support the CIT Lease with not only all of the equipment listed in Loeb's 2000 Appraisal but also with $3,000,000.00 in letters of credit "by or on behalf of B.C. Rogers Poultry, Inc." (P–11). McClelland's letter did not identify Rogers or Williams as the source for the letters of

---

8. "OLV" is defined as the estimated gross proceeds that could be expected from the forced piecemeal sale (and removal) of the property, privately negotiated. (P–7).

9. "FMV-for Removal" is defined as the estimated highest gross value which a willing buyer would be justified in paying, and a willing seller would be warranted in asking, if certain conditions are met. (P–7).

credit. Beyhan testified in his deposition that he assessed CIT's risk using the PAV figure of $1,681,100.00 from the Loeb Appraisal, which is why CIT required the letters of credit.

On December 12, 2000, Echiburu, on behalf of BCR, faxed a copy of the November 8, 2000, proposal from CIT to Painter, counsel for Williams. (P–11). Rogers and Williams realized that if they agreed to secure the Sale/Leaseback Transaction, they improved their own chances of recovering BCR's $25,000,000.00 debt to them. Painter prepared a term sheet, dated December 14, 2000, based on the refinancing plan proposed by the Senior Lenders and the sale/leaseback financing proposed by CIT, that identified Rogers and Williams as the source for both the $3,000,000.00 letters of credit and the $4,400,000.00 Bridge Facility.[10] (CIT–15). As Painter explained at Trial, Rogers and Williams understood that by agreeing to provide the letters of credit, they were trading one risk for another.

**McClelland's Note**

On December 14, 2000, Fielder, co-counsel for Williams, called McClelland at CIT and requested a copy of the Equipment List. McClelland sent Fielder the Equipment List accompanied by a handwritten note on a cover sheet that read: "Enclosed please find a copy of the equipment list that we will use as our exhibit A." (P–13). McClelland's note is the subject of Rogers and Williams' misrepresentation claim against CIT. As was mentioned previously, some of the items in the Equipment List had already been sold to, and leased back from, another lessor, a fact not disclosed by McClelland in his note. Whether McClelland knew, or should have known, is disputed by the parties.

On December 22, 2000, Fielder or his paralegal, Sherry T. Sharp ("Sharp"), faxed the Equipment List to the following individuals: (1) Painter, (2) Crews Lott ("Lott"), counsel for BCR, and (3) Hector Llorens ("Llorens"), counsel for the Senior Lenders. (P–14; CIT–16). The message on the cover sheet read, "Enclosed is the equipment list for the partial releases on the UCCs for B.C. Rogers Processing." (P–14). Fielder's purpose in faxing the Equipment List was to facilitate the completion of UCC–3 partial releases which would have to be filed in connection with the Sale/Leaseback Transaction by: (1) the Senior Lenders in order to release the Equipment from their primary lien and (2) Rogers and Williams in order to release the Equipment from the liens granted by BCR in connection with the Subordinated Debt. To that end, on January 9, 2001, Painter provided CIT with copies of the UCC–3 partial release forms filed by Rogers and Williams with respect to the Equipment. (CIT–30).

**The Letters of Credit**

Rogers and Williams entered into a separate Loan Agreement with BCR in which they agreed to provide $3,000,000.00 irrevocable standby letters of credit, naming CIT as the beneficiary. (P–57; CIT–18). To induce Rogers and Williams to provide the letters of credit, BCR agreed to reimburse them for all amounts drawn by CIT. (P–57; CIT–18). BCR also executed promissory notes to Rogers and Williams in accordance with the Loan Agreement. (CIT–19, CIT–20). Finally, BCR executed a Security Agreement granting a lien to Rogers and Williams on almost all of BCR's assets, except for the Equipment

**10.** The Bridge Facility, as mentioned previously, was a separate component of the refinancing plan proposed by the Senior Lenders.

and certain other collateral. (P–58; CIT–21).

Rogers caused Irrevocable Standby Letter of Credit No. 235 to be issued in the amount of $1,500,000.00 by Community Trust Bank on December 22, 2000, (P–18, P–55), and Williams caused Irrevocable Standby Letter of Credit No. RA03M1 to be issued in the amount of $1,500,000.00 by UBS PaineWebber Inc., f/k/a Paine-Webber Incorporated ("PaineWebber") for the account of the J. Kelley Williams Revocable Trust on December 27, 2000 (P–19, P–54). Both letters of credit were issued in favor of CIT as the beneficiary, and both were subject to automatic renewal. Under the terms of the letters of credit, CIT could draw upon them by presenting a sight draft, accompanied by the following statement, "We certify that B.C. Rogers Poultry, Inc. and B.C. Rogers Processors Inc. have defaulted on their obligation to The CIT Group/Equipment Financing, Inc. ("CIT") and that the amount represented by the accompanying draft is due and owing to CIT." (P–18, P–19). The letters of credit were not delivered to CIT until the closing of the CIT Lease.

**The CIT Lease**

On December 28, 2000,[11] BCR and CIT entered into the Master Lease Agreement, together with the related riders, schedules, exhibits, addenda, and amendments (the "CIT Lease"). (P–20; CIT–110). Pursuant to the terms of the CIT Lease, BCR sold CIT the Equipment for $4,000,000.00, and simultaneously, CIT leased it back to BCR for a sixty-month term at $71,551.56 per month. Attached to the CIT Lease was "Equipment Schedule No. 1," which is identical to the Equipment List. The CIT Lease required BCR to have in place for the duration of its term a letter of credit,

or letters of credit, totaling $3, 000, 000, 00. (P–20, ¶ 14(h)). Accordingly, the letters of credit obtained by Rogers and Williams were delivered to CIT at the closing. Notably, BCR agreed in the CIT Lease that it would not "create, incur, assume or suffer to exist any mortgage, lien, security interest, encumbrance or claim on or with respect to the Equipment....". (P–20, ¶ 11.1).

**The Two Letter Amendments**

On December 29, 2000, after the parties has entered into the CIT Lease, BCR executed two letter agreements amending the CIT Lease. (CIT–24, CIT–25; P–122, P–123). Pursuant to the terms of the first letter amendment (the "First Letter Amendment") (C–24, PIT–123), BCR and CIT agreed that CIT would disburse only $3,000,000.00 of the $4,000,000.00 due at the closing and would retain and hold back $1,000,000.00 (the "$1,000,000.00 Holdback") until BCR provided evidence, including UCC–3 partial releases, showing that title to the Equipment had been transferred under the CIT Lease "free and clear of all liens, claims, and encumbrances." (CIT–24; P–123). As a condition to the release of the $1,000,000.00 Holdback, CIT required BCR to provide written certification from an officer that BCR was not in default under the CIT Lease. (CIT–24; P–123).

In the second of the two letter agreements (the "Second Letter Agreement") (P–122; CIT–25), BCR and CIT agreed that BCR would perform certain lien searches within ninety days of the closing. Specifically, BCR agreed to provide the following: (1) documents evidencing the results of UCC and judgment lien searches conducted at the Office of the Mississippi

---

11. The parties stipulated that December 28, 2000, was the date of execution of the CIT

Lease. (*Pre–Trial Order,* Dkt. No. 373).

Secretary of State and the Chancery Court of Scott County, Mississippi (the location of BCR's plants) indicating that the Equipment was transferred to CIT free and clear of all liens and (2) documents evidencing that the Senior Lenders and Rogers and Williams had released their liens on the Equipment, pursuant to the filings of "partial release" UCC–3 forms.[12] (P–122; CIT–25)

The Second Letter Agreement provided that in the event BCR did not show that title to the Equipment was transferred free and clear within the time allotted, CIT could require BCR: (1) to provide CIT an additional letter of credit in an amount that, when combined with the $3,000,000.00 in the original letters of credit, would be sufficient to cover the full balance due under the CIT Lease (but in no event more than $1,000,000.00) or (2) to pay CIT all of the remaining rental payments due under the CIT Lease, less the $3,000,000.00 available under the original letters of credit (but in no event more than $1,000,000.00). (P–122; CIT–25). BCR's failure to do either would constitute an event of default under the CIT Lease.

**First Amendment to Revolving Credit and Term Loan Agreement**

These transactions led to the execution on December 29, 2000, of the First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement (the "First Amendment to Revolving Credit and Term Loan Agreement") (CIT–23), which amended the Revolving Credit and Term Loan Agreement executed the previous year in connection with the stock sale to the ESOTs. The amended agreement required BCR to obtain at least $3,000,000.00 as a result of the Sale/Leaseback Transaction by December 29, 2000, the same date as its execution.

**Post–Closing Lien Searches**

On January 3, 2001, BCR sent a letter to CIT's McClelland, with copies to Williams' counsel, Fielder and Painter, enclosing (1) a certificate stating that there had been a search of the "indexed UCC records of the office of the Chancery Clerk of Scott County, Mississippi" that named BCR as the debtor for the previous five years,[13] (2) a list of all the filings found, and (3) copies of those filings listed. (P–23; CIT–139). One of the enclosed copies was a financing statement filed on form UCC–1 (No. 079553) by Heller Financing Leasing, Inc. on January 5, 2000, which was almost one year before the date of the CIT Lease. (P–23; CIT–26). Attached to that financing statement was a list of all of the equipment, identified by serial number, that BCR had leased from Heller Financing Leasing, Inc. (the "Heller Lease"). Some of the equipment subject to the Heller Lease also appears on the Equipment List, but that fact was not disclosed in BCR's cover letter. CIT did not notify BCR that there was a problem in the title to some of the Equipment and neither did anyone on behalf of Rogers or Williams.

On January 8, 2001, BCR sent a letter to McClelland enclosing the response to its information request filed on form UCC–11 with the Office of the Mississippi Secretary of State, in which it requested a listing of all financing statements filed through December 28, 2000, that named BCR as the

---

**12.** Specifically, BCR was required to provide CIT, at BCR's cost and expense, "Secretary of State (Mississippi) and County (Scott County) UCC lien searches as well as tax lien and judgment lien searches, which searches must evidence that such Equipment was transferred to [CIT] free and clear of all liens, claims and encumbrances, subject to the liens of [the Senior Lenders]." (P–123; CIT–24).

**13.** An original financing statement is effective for five years from the date filed. Miss.Code Ann. § 75–9–515(a).

debtor. (P–24). One of the filings enclosed was a UCC–1 (No. 01391922) filed by Heller Financing Leasing, Inc. on January 5, 2000, which had an attached "Schedule B" identical to the one filed by Heller Financing Leasing, Inc. with the Chancery Clerk of Scott County on the same date, January 5, 2000. (P–24). Again, CIT did not notify BCR that there was a problem in the title to some of the Equipment and neither did anyone on behalf of Rogers and Williams. Instead, Fielder sent a letter to CIT on January 9, 2001, in which he remarked "by Wednesday you will have sufficient information which will allow you to release the remaining million dollars to B.C. Rogers pursuant to the terms of the CIT Lease Agreement." (CIT–29).

### Post–Closing UCC–3 Partial Releases

On January 5, 2001, Fielder's paralegal, Sharp, faxed the Equipment List obtained from McClelland to an attorney retained by BCR to prepare the UCC–3 partial releases. (CIT–27). On that same date, BCR's counsel sent Painter the UCC–3 partial releases for filing in Scott County, Mississippi, and in the Mississippi Secretary of State's Office. (CIT–28). On January 9, 2001, Painter sent CIT the executed UCC–3 release forms filed by Rogers and Williams. (CIT–30).

### Release of the $1,000,000.00 Holdback

Pursuant to the First Letter Agreement, Echiburu furnished CIT with an officer certificate on January 11, 2001, stating that he had reviewed the CIT Lease and had confirmed that BCR had not defaulted under the CIT Lease as of that date, and instructing CIT to release and pay the $1,000,000.00 Holdback to BCR. (CIT–31). His statement that BCR was not in default was not entirely correct. Although BCR was apparently not in default in its lease payments, the lien searches revealed that some of the Equipment sold to CIT was subject to the Heller Lease. The officer certificate, however, did not mention the Equipment or the lien searches that BCR was required to provide under the First Letter Amendment. Nevertheless, CIT paid BCR $1,000,000.00.[14]

### Negotiations to Sell BCR's Assets

Despite the amendment to the Revolving Credit and Term Loan Agreement and the related transactions, BCR continued to struggle financially. Russia's ban on imports of chicken from the United States and a general decline in the poultry industry, among other factors, pushed BCR to its financial demise. In August, 2001, BCR began negotiating the sale of its fixed assets to Koch Foods of Mississippi, LLC, Koch Properties of Mississippi, LLC, and Koch Farms of Mississippi, LLC (collectively referred to as "Koch"). The sale was negotiated on behalf of Koch by: Joseph Charles Grendys ("Grendys"), president and CEO of Koch; Mark J. Kaminsky ("Kaminsky"), chief financial officer of Koch; and Clarence Daniel Nuckolls ("Nuckolls"). Although Koch and BCR were competitors in the poultry industry, Koch was interested in purchasing BCR's plants because BCR processed certain chicken products that Koch did not. Koch agreed to purchase BCR's assets for $42,000,000.00, on the condition that BCR file bankruptcy and obtain approval of the sale from the bankruptcy court to allow the transfer to take place free and clear of any prior liens.

---

14. In the summer of 2001, Tyco International Ltd ("Tyco") acquired The CIT Group Inc., and in less than one year, sold its financing unit in an initial public offering. The CIT Group Inc. then once again became an independent public company. Because it makes no difference to the issues raised in this proceeding, the Court will refer to Tyco as CIT during this entire time frame.

### The Double–Leasing Issue & BCR

As a result of the due diligence it performed in preparation of the sale, Koch discovered a possible double-leasing problem. Echiburu testified that it was then that he became aware of Koch's allegation of a double lease issue. Echiburu's initial reaction was disbelief. He and Lucroy began investigating the issue, but they were pulled away in order to assist with the sale to Koch. Their brief, preliminary investigation revealed that some of the equipment identified by Koch had not been double leased after all, but they were unable to determine the status of the rest of the equipment.

### BCR's Bankruptcy Case

On November 19, 2001, BCR filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The cases were jointly administered under Case No. 01–06516. By then, BCR had defaulted in its payments under the terms of the CIT Lease. BCR's delinquency under the CIT Lease and its bankruptcy filing captured CIT's attention. At this juncture, the handling of the CIT Lease was assigned to two CIT employees: Lawrence A. Jones ("Jones"), portfolio manager in charge of the bankruptcy department, and Lee Richard McDermid ("McDermid"), portfolio manager in charge of the asset management department.

### Koch's Purchase of BCR's Fixed Assets

As part of its first-day motions, BCR filed a *Motion for Order Authorizing Debtors to Sell Assets and to Assume, Assign and Sell Certain Executory Contracts and Unexpired Leases that Relate Thereto Free and Clear of All Liens, Claims and Encumbrances* (the "Sale Motion") (Dkt.

No. 373). In the Sale Motion, BCR sought approval of Koch's offer pursuant to 11 U.S.C. § 363.[15] (CIT–34). This Court approved the sale of BCR's fixed assets, which included BCR's processing plants in Morton, Mississippi, and Forest, Mississippi, but did not include any of the leased equipment located in those plants.

The sale closed on December 29, 2001. At that time, Koch took over the operations of BCR's plants. Koch employed Echiburu in a non-management role for a few additional months to assist with the transition.

### The Rejection of the CIT Lease

Pursuant to the terms of an agreed *Order* entered on December 20, 2001, BCR's failure to pay CIT all amounts due under the CIT Lease by a date certain would result in the CIT Lease being deemed rejected under § 365, and the automatic stay being lifted under § 362. (Dkt. No. 204). When BCR failed to bring its payments current, the CIT Lease was deemed rejected, and the stay lifted, as of December 27, 2001.[16] After the rejection of the CIT Lease, McDermid assigned Shawn Kevin Mulgrew ("Mulgrew"), portfolio manager in the asset management department, the task of disposing of the Equipment. Mulgrew testified in his deposition that it was his responsibility to recover and liquidate any and all assets that had been repossessed or voluntarily returned to CIT. Mulgrew reported directly to McDermid.

CIT did not repossess any of its Equipment from the premises of Koch's poultry operations after BCR's rejection of the CIT Lease, but instead allowed Koch to continue using the bulk of its Equipment

**15.** Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

**16.** Rogers and Williams contend the CIT Lease was deemed rejected on January 1, 2002.

without interruption for several months thereafter while CIT negotiated a purchase agreement with Koch. Rogers and Williams allege that this decision by CIT was the result of a conspiracy between CIT and Koch. Since the proceeds recovered from the sale of the Equipment would affect the final amount owed CIT under the CIT Lease, CIT's decision not to repossess the Equipment at this juncture, according to Rogers and Williams, failed to preserve the full value of the Equipment to their detriment.

**Koch's Negotiations with Lessors of Equipment**

Kaminsky, CFO of Koch, testified in his deposition that shortly after Koch took over the poultry operations, a dozen or so lessors began demanding that Koch either pay rent or return their equipment to them. Kaminsky assigned Nuckolls, a Koch employee, the task of contacting all of the lessors and negotiating new rental or purchase agreements for the equipment that Koch was interested in using. Kaminsky testified that he decided at the outset that he would not accept the same terms that BCR had agreed to with its many lessors because he disagreed with the values given the leased equipment. (P–134K).

Echiburu testified at Trial that it was a common business practice for BCR to lease the equipment and machinery in its plants. The CIT Lease was only one of eleven such leases. (P–25, P–62, P–134K). When asked about the amount of equipment leased by BCR, Grendys, president and CEO of Koch, testified in his deposition that it seemed to him that BCR had even leased the concrete. Nuckolls became immersed in determining the owners of the equipment in Koch's newly-acquired plants.

**The Double–Leasing Issue & CIT**

Echiburu testified that sometime near the end of 2001, he informed Painter, counsel for Williams, and McClelland at CIT that there was a double-leasing issue as to some of the equipment in BCR's plants. A note in CIT's files dated December 26, 2001, includes the statement, "Maybe double fn. one lease." (P–25). The same note also includes the statement, "Koch Foods contacting 12 leasing companies (CIT is one)." (P–25).

**CIT Draws under Letters of Credit**

On January 3, 2002, CIT filed two proofs of claim evidencing the accelerated amounts due under the CIT Lease in the amount of $4,497,227.24, as well as the amounts due under other leases. (P–27; CIT–141). On that same date, CIT wrote a letter to BCR transmitting copies of the proofs of claim and requesting that it voluntarily surrender the Equipment to CIT for disposition.[17] (P–28).

Jones at CIT ordered that CIT present sight drafts to the issuers of the letters of credit in the combined amounts of $3,000,000.00, the maximum amount available. (P–29, 30). This was done on January 4, 2002, and January 8, 2002. In response, Rogers retained separate counsel and filed against CIT and Community Trust Bank, a state bank created under

---

**17.** The CIT Lease provided that CIT could, at its option, do one or more of the following in the event of BCR's default:

(d)(i) sell the Equipment at private or public sale, in bulk or in parcels, with five (5) business days written notice to Lessee, without having the Equipment present at the place of sale or (ii) lease, otherwise

dispose of, retain or keep idle all of part of the Equipment; Lessor may use Lessee's premises for a reasonable period of time in order to remove the Equipment and for any or all of the foregoing, but any such reasonable period of time shall not exceed one hundred twenty (120) days;

(P–20, ¶ 15.1(d)).

Louisiana law, a petition for temporary restraining order and for preliminary and permanent injunctive relief in the Third Judicial District Court for Lincoln Parish, Louisiana, in case number 47,809 on January 8, 2002. (CIT–36). On that same day, the state court issued a temporary restraining order ("TRO") against both CIT and Community Trust Bank, the issuer of the letter of credit obtained by Rogers, enjoining payment of the funds.

Painter informed CIT in a letter that although the TRO pertained only to the letter of credit obtained by Rogers, CIT was precluded from drawing on Williams' letter of credit pending resolution of the TRO. (P–33). He based his assertion on a provision of the CIT Lease that he interpreted as requiring CIT to draw equal amounts simultaneously under each letter of credit. (P–33). CIT withdrew the sight draft presented to Community Trust Bank, but did not withdraw the sight draft to PaineWebber. Shortly thereafter, CIT received $1,500,000.00 from PaineWebber, the issuer of the letter of credit obtained by Williams. CIT received $1,500,000.00 from Community Trust Bank, the issuer of the letter of credit provided by Rogers, only after the TRO dissolved on its own terms on January 14, 2002, when Rogers failed to post the required bond.[18] (CIT–37).

Rogers and Williams reimbursed the respective issuers of their letters of credit. Despite the Loan Agreement, BCR did not reimburse Rogers and Williams. They filed proofs of claims evidencing BCR's obligation to reimburse them for CIT's draws on the letters of credit.

### The 2002 Loeb Desktop Appraisals

Although the proceeds of the letters of credit had already been paid CIT, Rogers and Williams believed that CIT would return all or most of their money to them upon a commercially reasonable sale of the Equipment. To that end, Williams retained Newman on or about January 4, 2002, to update the Loeb 2000 Appraisal (P–65) to confirm the value of the Equipment. Because Loeb did not physically inspect the Equipment, the report was not a formal appraisal. It was described by Newman in the engagement letter as a "[d]esktop review of our appraisal of October 24, 2000." (P–66). Loeb issued two separate reports for FMV–In Place and OLV–In Bulk [19] (the "2002 Loeb Desktop Appraisals"). (P–31). As of January 7, 2002, the 2002 Loeb Desktop Appraisals estimated the value of the Equipment, as follows:

| FMV–In Place | OLV–In Bulk |
| --- | --- |
| $3,320,500.00 | $1,625,900.00 |

(P–31, CIT–95).

### The Double–Leasing Issue Revisited

In connection with his earlier investigation into Koch's claim that BCR had double leased some of its equipment, Echiburu sent a facsimile to Painter on January 9, 2002, that included a chart prepared by Lucroy. (P–70). Echiburu had marked the items of equipment he thought had not been double leased. He left unmarked the equipment he was unsure about.

Also on January 9, 2002, Mulgrew sent a facsimile on behalf of CIT to Koch employee Nuckolls with a 31–page list describing the assets CIT had leased to BCR. (P–

---

18. Rogers and Williams claim that CIT's failure to draw equal amounts under each letter of credit at the same time constituted a breach of the CIT Lease, a contract claim that fails for reasons discussed later in this opinion.

19. OLV–In Bulk is defined as the estimated gross proceeds that could be expected from a bulk sale.

134Q; CIT–41, CIT–147 at Ex. 13). Mulgrew took this list directly from the Equipment List attached to the CIT Lease. On January 25, 2002, Nuckolls responded by faxing Mulgrew a spreadsheet listing the equipment, including the Equipment under the CIT Lease, that Koch wished to purchase. (P–75). The list included the amount of its offer for each item of equipment. On the cover sheet to the facsimile, Nuckolls wrote, "The attached spreadsheet lists equipment we would like to make an offer on and the equipment we cannot use. The items with asterisks beside them appear on other leases as well." (P–75). CIT contends that it was at this time that it first learned that another lessor claimed an interest in some of its Equipment. (CIT Brief at 34). The issue of double-leased equipment was not unique to the CIT Lease; other BCR leases included double-leased equipment.

## CIT's Efforts to Sell the Equipment

On January 29, 2002, Painter, on behalf of Williams, sent a letter to CIT along with a copy of the 2002 Loeb Desktop Opinion that included the FMV–In Place figure, but he did not send the separate report that included the OLV figure. (P–34). In his letter, Painter complained that CIT had failed to act in a commercially reasonable manner in protecting the Equipment because it allowed Koch to use it without paying any rental fee. Painter insisted that the "fair market value" of the Equipment was $3,320,500.00, as stated in the 2002 Loeb Desktop Opinion, and that Koch should not pay less than that amount. As noted previously, the higher the price CIT received for the Equipment, the greater chance that CIT would return all or some of the proceeds from the letters of credit. For this reason, Painter claimed that Rogers and Williams had a far greater investment in the Equipment than CIT did. Rogers, through separate counsel, wrote a letter on February 6, 2002, to CIT that mirrored Williams' complaints. (P–35).

## The Adversary Proceeding

Rogers and Williams each commenced on February 7, 2002, nearly identical civil actions against CIT and Koch in the Chancery Court of Scott County, Mississippi. On February 19, 2002, CIT removed the state court complaints to the United States District Court for the Southern District of Mississippi, where the cases were consolidated and then referred to this Court for adjudication on March 28, 2003 (Adv. Dkt. No. 1).

## The 2002 EEC Appraisal

In the meantime, on March 4, 2002, Nuckolls at Koch sent Mulgrew at CIT an offer of $1,250,000.00 to purchase from CIT all of the Equipment except for ten items that it believed were subject to the Heller Lease and eight other items that Koch was not interested in acquiring and later returned to CIT. (P–78; CIT–105). Mulgrew at CIT engaged Equipment Exchange Company of America, Inc. ("EEC") and its president Robert J. Breakstone ("Breakstone") to conduct a physical inspection and formal appraisal of the Equipment to determine the reasonableness of Koch's offer. (P–82). EEC submitted an appraisal report to CIT, effective as of March 22, 2002 (the "2002 EEC Appraisal"), that used four different valuations, including distressed market value or auction value ("DMV") and fair market value-in place ("FMV–In Place") (P–82; CIT–50). In the 2002 EEC Appraisal, the Equipment [20] was valued, as follows:

---

20. By mistake, EEC did not include one of four Johnson Food Equipment Rotary Bird Openers in the Equipment List.

| DMV | OLV | FMV | FMV–In Place |
|---|---|---|---|
| $1,276,400.00 | $1,686,900.00 | $2,225,900.00 | $2,751,450.00 |

Breakstone testified at Trial that in his opinion the 2002 EEC Appraisal Report was more accurate than the 2002 Loeb Desktop Appraisal.

### CIT Verifies Double–Leased Equipment

On April 19, 2002, William D. Robinson ("Robinson"), who managed the bankruptcy and workout departments at CIT, took over from Mulgrew the responsibility of handling the sale of the Equipment. Robinson compared the Equipment List with the equipment schedule attached to the Heller Lease, which he had obtained from counsel for Heller Financing Leasing, Inc. He then verified that ten items of Equipment were in fact subject to the Heller Lease, which predated the CIT Lease (the "Double–Leased Equipment").[21]

### Negotiations Between CIT and Koch for the Sale of Equipment

Robinson at CIT escalated the sales negotiations with Koch by sending a copy of the 2002 EEC Appraisal directly to Koch's CEO, Grendys, rather than to Nuckolls. Robinson also prepared and sent a chart to Grendys that reduced the totals in the 2002 EEC Appraisal Report by: (1) the value of the Double–Leased Equipment and (2) the value of other items that Koch had declined to purchase. (CIT–53). The adjusted chart showed that the remaining equipment had the following values:

| DMV | OLV | FMV | FMV–In Place |
|---|---|---|---|
| $ 834,100.00 | $1,123,600.00 | $1,494,600.00 | $1,870,450.00 |

Robinson testified in his deposition that he spoke with Grendys over the telephone on several occasions and that his goal in his conversations with Grendys was to persuade Koch to increase its offer from $1,250,000.00 to the adjusted FMV–In Place number, $1,870,450.00. Grendys testified in his deposition that he did not want to pay much more than OLV but finally agreed to increase Koch's offer to $1,300,000.00. (CIT–56). As reflected in Robinson's adjusted chart, that price was essentially the midpoint between the OLV and FMV figures. CIT also agreed to finance the sale itself. Robinson initiated the process to obtain approval of the sale from the CIT credit department.

### Negotiations Between CIT and Koch for Koch's Use of Equipment

In late April, 2002, Robinson talked to Grendys about paying rent for the months Koch used the Purchased Equipment prior to the sale. In the end, Koch agreed to structure the financing for the sale as if it had taken place four months earlier, thereby reducing the total number of payments due from 48 months to 44 months. Koch also agreed to pay an additional $49,057.50 in order to compensate CIT for Koch's use of the Purchased Equipment. (P–101; CIT–108). Nuckolls at Koch testified that Koch did not pay any other lessors for its use of their leased equipment that Koch later purchased.

21. Ultimately, Koch purchased the Double–Leased Equipment from G.E. Capital Corporation Capital Funding Inc., the successor to Heller Financing Leasing, Inc. (P–87; CIT–52).

## CIT's Notice of Sale of Equipment

On June 5, 2002, CIT sent a letter to BCR informing it of Koch's $1,300,000.00 offer, noting that pursuant to paragraph 15.1(d) of the CIT Lease, the sale of any of the Equipment would not take place any earlier than five business days after the date of its letter. (P–92; CIT–57). CIT also wrote a letter to Rogers and Williams, informing them that if they believed Koch's offer of $1,300,000.00 to purchase some of the Equipment was not commercially reasonable, they could make an offer higher than Koch's or they could purchase from CIT its position as lessor under the CIT Lease (and thereby accede to CIT's rights). (P–37). CIT included in its letter a copy of the offer from Koch which itself included the list from Koch that designated some equipment as "EQUIPMENT NOT AVAILABLE–LEASED FROM HELLER." (P–92).

On June 11, 2002, Rogers and Williams responded to CIT's letter, again objecting to the proposed sale to Koch on the ground that the sale would not be commercially reasonable if it was less than the FMV–In Place figure as reflected in one of the 2002 Loeb Desktop Appraisals. (P–38, P–39). Williams also inquired why Koch's offer referred to "EQUIPMENT NOT AVAILABLE." On June 20, 2002, CIT responded to their letters by enclosing a copy of the 2002 EEC Appraisal. (P–93; CIT–58). CIT also informed Rogers and Williams that after BCR had filed bankruptcy, CIT had discovered that certain items of the Equipment had been double leased by BCR.

## The Sale of the Equipment to Koch

On June 28, 2002, the CIT credit department approved CIT's financing of the proposed sale of Equipment to Koch. On July 18, 2002, CIT arranged for the repossession of those items of equipment that Koch did not want to purchase. (P–94). Koch later agreed to increase its previous offer of $1,300,000.00 by $8,200.00 to account for the value of a John Food Equipment Rotary Bird Opener that EEC had inadvertently failed to include in the 2002 EEC Appraisal and two other items. (CIT–107). On October 8, 2002, CIT closed the sale to Koch of certain items of Equipment for $1,308,200.00 (the "Purchased Equipment") (P–104; CIT–74, CIT–75).

## Debt Remaining Under CIT Lease

Since the filing of the bankruptcy case, CIT has collected approximately $4,471,844.50 in payment of BCR's debt under the CIT Lease, which includes $3,000,000.00 from the letters of credit, $1,308,200.00 from Koch for the Purchased Equipment, $49,057.50 from Koch for its use of the Purchased Equipment, and $114,587.00, from the sale of the remaining equipment to other vendors that Koch had returned to CIT. Before the filing of the bankruptcy case, BCR had paid CIT $813,183.48 in rent and use taxes, for a total collected amount of $5,285,027.98. CIT claims that BCR owed it a total of $5,658,291.28 under the CIT Lease, including late charges, use taxes, repossession expenses, property taxes, and legal expenses incurred through January 31, 2007.[22] (CIT–138, CIT–147). The differ-

---

22. Copies of invoices reflecting attorney fees and legal expenses incurred by CIT's counsel, and submitted to CIT for payment from January 17, 2002, through September 30, 2009, were marked for purposes of identification at Trial as collective exhibit CIT–87. That exhibit, which consisted of over 700 pages, was not admitted into evidence. The Court ruled at Trial that it would not adjudicate the reasonableness of CIT's attorney's fees and legal expenses, or the extent to which these fees constituted additional amounts BCR owed CIT under the CIT Lease, except if and when it became necessary to do so. *See* Fed. R. Bankr. 7042(b) ("[f]or convenience, to avoid prejudice, or to expedite and economize, the

ence between these amounts ($5,658,-291.28–$5,285,027.98) equals $373,263.30, the amount that CIT claims that BCR still owes it under the CIT Lease.

### Settlement of Claims by Rogers and Williams Against BCR and Koch

On September 10, 2003, this Court entered an *Order Approving Motion of Debtors and Official Committee of Unsecured Creditors Requesting Approval of Settlement of Any and All Claims, Challenges or Causes of Action of Any Kind Whatsoever Against Lenders and Other Parties Pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code* (Dkt. No. 815). Under the terms of this court-approved settlement (the "Mutual Global Release"), Rogers and Williams settled all claims they may have had against BCR, including BCR's obligation under the Loan Agreement to reimburse them for draws on the letters of credit. However, they specifically preserved their claims against CIT that form the basis for this adversary proceeding.

By *Agreed Order,* this Court on February 5, 2004, consolidated this proceeding with Adversary Proceeding No. 02–00078–EE, a declaratory judgment action that CIT had previously commenced against BCR. (Adv. Dkt. No. 7). Also, as part of that *Agreed Order,* the Trustee of the B.C. Rogers Liquidating Trust, H. Kenneth Lefoldt ("Lefoldt"), replaced BCR as a defendant in this proceeding.[23] Rogers and Williams filed their *Amended Complaint*

against CIT and Koch on February 23, 2004.

On March 22, 2004, Lefoldt filed objections to CIT's proofs of claims. (Dkt. Nos. 1221, 1228, 1240). Lefoldt's objections were held in abeyance by *Agreed Order* entered on May 5, 2004, pending the resolution of this adversary proceeding. (Dkt. No. 1289).

On April 4, 2006, Rogers and Williams filed their *Second Amended Complaint*[24] against CIT, Koch, and Lefoldt. (Adv. Dkt. No. 63). Thereafter, Rogers and Williams agreed to accept $10,000.00 in settlement of all claims against Koch, and Koch was dismissed from this adversary on March 22, 2007. (Adv. Dkt. Nos. 133, 134, 136 & 138).

### The Trial

The Trial, which was initially scheduled to begin on November 4, 2009, was continued on the *Parties' Motion for Continuance* (Adv. Dkt. No. 349) when counsel for CIT became aware that CIT Group Inc., an affiliate of CIT, had filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 1, 2009, in the United States Bankruptcy Court for the Southern District of New York. *See Agreed Order* (Adv. Dkt. No. 351). The extent to which the bankruptcy case of CIT Group Inc. affected CIT was unclear at that time. *See Order Confirming Plan, In re CIT Group Inc.,* No. 09–16565–ALG, 2009 WL 4824498 (Bankr.S.D.N.Y. Dec.8, 2009). Once it was determined that CIT

---

court may order a separate trial of one or more separate issues . . . .") *Id.*

**23.** The BCR Liquidating Trust was created pursuant to the *First Amended Joint Plan of Liquidation of B.C. Rogers* (the *"Plan"*) filed on June 19, 2003, and this Court's *Order* and *Final Judgment* confirming the *Plan* on September 10, 2003. (Dkt. Nos. 784, 813 & 814). The BCR Liquidating Trust succeeded as to all of BCR's assets. This proceeding was

initiated prior to the creation of the BCR Liquidating Trust.

**24.** Rogers and Williams amended their complaint to add the J. Kelley Williams Revocable Trust as a party to this proceeding, given that the letter of credit in dispute was drawn upon its account, and to clarify that Williams' claims against CIT arose out of his capacity as Trustee of the J. Kelley Williams Revocable Trust. (P–61, P–133).

was not part of CIT Group Inc.'s bankruptcy case,[25] the Trial was re-scheduled.

On November 16, 2009, this Court issued its *Memorandum Opinion* denying CIT's motions for partial summary judgment in *Rogers v. CIT (In re B.C. Rogers Poultry, Inc.)*, No. 03–00122–EE, 2009 WL 3856428 (Bankr.S.D.Miss. Nov.16, 2009). On November 25, 2009, CIT filed a *Motion to Amend Findings, and to Alter or Amend Judgment or, Alternatively, for Relief from Judgment* (Adv. Dkt. No. 362). CIT disputed some of the material facts recited in the *Memorandum Opinion*, which the Court had viewed in the light most favorable to Rogers and Williams, resolving all doubt in their favor, pursuant to the familiar standards embodied in Rule 56 of the Federal Rules of Civil Procedure.[26] CIT sought clarification that the *Memorandum Opinion* did not preclude CIT from contesting these same facts at Trial and also sought clarification as to whether the Court had certified the *Final Judgment* for immediate appeal. Rogers and Williams filed a response on December 14, 2009 (Adv. Dkt. No. 365). In an *Order Denying Motion to Amend Findings, and to Alter or Amend Judgment or, Alternatively, for Relief from Judgment* (Adv. Dkt. No. 368) entered on December 16, 2009, this Court ruled that the *Memorandum Opinion* and *Final Judgment* did not circumscribe the factual disputes CIT could raise at Trial and did not constitute a final judgment for appeal purposes.

A *Pre–Trial Order* (Adv. Dkt. No. 373) was entered on March 12, 2010, and was amended in certain respects by the parties by *Agreed Order* (Adv. Dkt. No. 382) on April 12, 2010.

The claims asserted by Rogers and Williams against CIT, as set forth in the *Pre–Trial Order*, include: (1) misrepresentation, (2) conspiracy, (3) breach of the duty of good faith and fair dealing, (4) breach of the duty to dispose of the Equipment in a commercially reasonable manner, (5) unjust enrichment, and (6) breach of the CIT Lease regarding the timing of draws upon the letters of credit, unauthorized draws upon the letters of credit, and entitlement to an accounting. Rogers and Williams seek the return of the $3,000,000.00 they paid the issuers of the letters of credit; damages for the commercially unreasonable sale of the Equipment pursuant to Miss.Code Ann. § 75–9–625; punitive damages pursuant to Miss.Code Ann. § 11–1–65; attorney's fees; and interest (pre-judgment and post-judgment) pursuant to Miss.Code Ann. § 75–17–7 and 28 U.S.C. § 1961. (*Pre–Trial Order*, at 5–6). CIT reserved its right to seek an award of attorney's fees under Rule 9011 of the Federal Rules of Bankruptcy Procedure, 28 U.S.C. § 1927, and 11 U.S.C. § 105(a). (*Pre–Trial Order*, at 18).

The Trial took place over six days beginning on April 15, 2010, and ending on April 23, 2010. On the first day of Trial, the Court took judicial notice of its own files, including all filings made in this adversary proceeding and in the main bankruptcy case.

**The Post–Trial Briefs**

At the conclusion of the Trial on April 23, 2010, the parties requested and obtained the Court's permission to file simultaneous post-trial briefs. After several extensions of time, both parties filed their initial post-trial briefs on January 28,

---

**25.** That case was resolved by a pre-packaged plan of reorganization that was confirmed shortly after the filing of CIT Group Inc.'s petition for relief.

**26.** Federal Rule of Civil Procedure 56 is made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056.

2011.[27] On April 21, 2011, the parties filed simultaneous rebuttal briefs.[28]

## TWO PRELIMINARY OBSERVATIONS

Before addressing the merits, the Court has two preliminary observations. First, the post-trial briefs, when combined, are 369 pages long with 1,272 footnotes.[29] To put the length of the post-trial briefs in perspective, H.G. Wells's WAR OF THE WORLDS is just over 300 pages without footnotes. The considerable lapse of time between the Trial and this opinion is a direct result of the numerous extensions agreed to by counsel in the post-trial briefing schedule, which, in hindsight, were no doubt necessary to allow counsel to write such long tomes.[30]

Second, ten of the seventeen witnesses who "appeared" at Trial did so by means of designated portions of their deposition testimony. Although the credibility of live witnesses may be assessed by the Court by observing their demeanor in the courtroom, the Court has no similar means available for assessing the credibility of deposition witnesses.

**27.** The initial post-trial brief filed by Rogers and Williams will be cited as "Rogers and Williams Brief" (Adv. Dkt. No. 422), and CIT's initial post-trial brief will be cited as "CIT Brief." (Adv. Dkt. Nos. 423–425).

**28.** The rebuttal brief filed by Rogers and Williams will be cited as "Rogers and Williams Rebuttal Brief" (Adv. Dkt. No. 435), and CIT's will be cited as "CIT Rebuttal Brief" (Adv. Dkt. No. 434).

**29.** In fairness, CIT's briefs are more than twice as long as Rogers' and Williams' briefs.

**30.** The Court will include reasonable page limitations in the future.

**31.** This finding of core jurisdiction is based on existing precedent in the United States

## JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(B) and § 157(b)(2)(O).[31]

## CONCLUSIONS OF LAW

The Court will address first Rogers' and Williams' common-law claims of misrepresentation and civil conspiracy. Second, the Court will address Rogers' and Williams' claims based on CIT's alleged breach of the CIT Lease. These contract claims include: (1) a violation of the covenant of good faith and fair dealing, (2) breach of the duty to dispose of the Equipment in a commercially reasonable manner, and (3) breach of the obligation concerning the timing of draws under the letters of credit. Last, the Court will address Rogers' and Williams' common-law claims of unjust enrichment.

### A. Misrepresentation

Rogers' and Williams' misrepresentation claims are based in large part on CIT's alleged representation or omission about the quantity (and thus the total value) of

Court of Appeals for the Fifth Circuit. Although the parties have not raised the issue of jurisdiction, the Court notes that after the Trial of this adversary proceeding, the United States Supreme Court issued its opinion in *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (June 23, 2011), in which the Supreme Court nullified as unconstitutional 28 U.S.C. § 157(b)(2)(C) in an adversary proceeding that involved a state-law counterclaim. The implications of the *Stern* decision, including the extent to which it curtails bankruptcy court jurisdiction, remain to be determined by the Fifth Circuit. *See In re Orso,* 214 F.3d 637, 641 n. 5 (5th Cir.2000), *rev'd on other grounds on reh'g en banc,* 283 F.3d 686 (5th Cir.2002) (bankruptcy courts are not empowered to overturn Fifth Circuit precedent).

the Equipment covered by the CIT Lease before Rogers and Williams caused their letters of credit to issue, which occurred, respectively, on December 22, 2000, and December 27, 2000. The centerpiece is the cover letter to a facsimile dated December 14, 2000, from McClelland of CIT to their attorney, Fielder, that stated in McClelland's own handwriting: "Dave— Enclosed please find a copy of the equipment list that we will use as our exhibit A." (P–13; P–14). Attached to the cover letter was the Equipment List that later became part of the CIT Lease. (P–20). Although the Equipment List included 169 items, it was later disclosed that ten of these items had already been leased from Heller Financing Leasing, Inc. (P–93; CIT–57). As a result, in the end CIT was able to repossess and sell only 159 items of Equipment, the proceeds from which were substantially less than the amount BCR owed under the CIT Lease. Rogers and Williams claim that McClelland knew, or should have known, that the Equipment List included items subject to the Heller Lease, and that he fraudulently or negligently misrepresented to them the number of the items that would support the CIT Lease in order to induce them to provide the letters of credit. (P–37; CIT–57).

The only disputed issue as to their misrepresentation claims, according to Rogers and Williams, is when McClelland knew (or should have known) that certain items in the Equipment List had been double leased. Rogers and Williams present numerous reasons why the evidence at Trial establishes McClelland's knowledge by December 14, 2000, the date McClelland faxed the note, if not earlier. CIT counters that McClelland did not know about the double-leased equipment at any time before November 19, 2001, when BCR filed bankruptcy. CIT also raises other defenses to Rogers' and Williams' misrepresentation claims. CIT contends: (1)

that McClelland's note was not a false representation in any respect, (2) that McClelland did not intend for Rogers or Williams to rely on the note in deciding to provide the letters of credit, and (3) that neither Rogers nor Williams reasonably relied upon McClelland's note. The Court will examine Rogers' and Williams' claims of intentional or fraudulent misrepresentation separately from their claims of negligent misrepresentation.

**1. Intentional or Fraudulent Misrepresentation**

Under Mississippi law, the elements of intentional misrepresentation must be proven by clear and convincing evidence. They are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Gallegos v. Mid–South Mortg. & Inv., Inc.,* 956 So.2d 1055, 1059 (Miss.Ct.App.2007). The elements of intentional misrepresentation are nearly identical to the elements of common-law fraud. *Id.*

**a. Did McClelland's Note Constitute a Misrepresentation of Fact?**

Rogers and Williams claim that McClelland's note constituted a misrepresentation concerning which items of Equipment would be covered by the CIT Lease and, consequently, the total value of those items. In other words, Rogers and Williams contend that McClelland's note was tantamount to confirmation by CIT that all of the items of Equipment were owned by BCR free and clear of any liens and, more important, that the value of

those items was sufficient to fully secure the CIT Lease. CIT, on the other hand, insists that McClelland's note was true. The Equipment List that he forwarded to Fielder on December 14, 2000, according to CIT, was truly the Equipment List that was attached as an exhibit to the CIT Lease. CIT strenuously denies that McClelland's note makes any affirmative statement about the value of the Equipment.

The Court agrees with CIT that McClelland's note did not contain a materially false statement. Despite Rogers' and Williams' protestations to the contrary, there was no affirmative representation by McClelland that the Equipment was free of liens or claims by other lessors of BCR and no affirmative representation that the value of the Equipment at that time was nearly $4,000,000.00. It is undisputed that the Equipment List did not originate with McClelland at CIT but with Lucroy at BCR, and that Lucroy, not McClelland, verified it at the request of Loeb, the appraiser.[32] Also, there is no evidence that CIT requested that the "new price" value be shown in the Equipment List.

Rogers and Williams attempt to support their claim that McClelland's note constituted a false representation by asserting that information about the value of the Equipment was central to the Sales/Leaseback Transaction and just as important to CIT as it was to them. It is unclear to the Court how this assertion transforms the note into an affirmative statement about the quantity or value of the Equipment. In any event, Rogers and Williams overstate the importance of the value of the Equipment to CIT because the Equipment was not CIT's only collateral. For reasons explained by Beyhan in his deposition testimony, the CIT Lease was also secured by the letters of credit. Moreover, if CIT thought that the Equipment was worth $4,000,000.00 at that time, why would CIT have required $3,000,000.00 letters of credit as additional collateral? Even Rogers and Williams themselves did not rely solely on the value of the Equipment to secure BCR's obligation to reimburse them, but obtained promissory notes and a Security Agreement from BCR to protect their interests. In short, the Court finds that the evidence at Trial failed to prove that McClelland made a misrepresentation of fact to Fielder concerning the value or quantity of the Equipment. The Court next turns to Rogers' and Williams' claims against CIT for fraudulent non-disclosure.

### b. Did McClelland Owe Rogers and Williams a Duty to Disclose the Heller Lease?

■ Rogers and Williams contend that the existence of the Heller Lease was a non-disclosed fact in McClelland's note that was material to the decision they made to provide the letters of credit. They further contend that McClelland, knowing that the Equipment List included Double–Leased Equipment, breached his duty to disclose that information to them.

■ Under Mississippi law, the omission of a material fact is equivalent to an affirmative misrepresentation and constitutes fraud if, for example, the speaker owed the hearer a duty of disclosure. *See Strong v. First Family Fin. Servs., Inc.,* 202 F.Supp.2d 536, 540 (S.D.Miss.2002) ("since silence, in the absence of a duty to speak, is not actionable, plaintiffs' claims for misrepresentation by omission are dependent on the existence of a duty of disclosure"). In that situation, the duty to disclose arises when one party has information that the other party is entitled to

---

**32.** As mentioned previously, there was no evidence offered at Trial that Lucroy, who died in 1997, or any other BCR employee, intended to double lease BCR's equipment.

know because of a fiduciary or other similar relationship of trust and confidence between them. *Mooneyham v. Progressive Gulf Ins. Co.*, 910 So.2d 1223, 1227 (Miss.Ct.App.2005). Even when there is no fiduciary relationship, the Mississippi Supreme Court has recognized that a duty to disclose arises when one party has previously misrepresented the facts. *See Welsh v. Mounger*, 883 So.2d 46 (Miss. 2004). It is this case law, where a duty arises to correct previous false information, upon which Rogers and Williams rely.

Rogers and Williams cite the Mississippi Supreme Court's decision in *Guastella v. Wardell*, 198 So.2d 227, 230–31 (Miss.1967) in support of their position. In *Guastella*, a real estate developer had represented to a potential purchaser of a lot in a subdivision that the subdivision was subject to covenants that restricted construction on the subdivision lots to single-family private residences. *Guastella*, 198 So.2d at 228. At the sale and closing of the loan for the purchase of the lot, the developer delivered a receipt from the chancery clerk's office indicating that restrictive covenants had been filed for record but stating nothing else. The lot purchaser discovered later that the restrictive covenants filed by the developer differed from the copy the developer had given him prior to the sale in one very important aspect: the filed covenants subjected only his lot and one other lot to residential restrictions, but not any of the other lots in the subdivision. The developer was free to construct whatever he wanted to on those other lots. The developer remained silent about this change in the restrictive covenants at the loan closing. When the developer attempted to build apartment buildings on the subdivision lots, the purchaser and other lot owners sought an injunction.

Adopting the rule embodied in the RESTATEMENT (SECOND) OF TORTS § 551,[33] the Mississippi Supreme Court equated the developer's silence with "an affirmation that a state of things existed which did not exist." *Guastella*, 198 So.2d at 230–31. His failure to speak constituted fraud because "[a] party to a business transaction, under these circumstances, is under a duty to disclose to the other party, before the transaction is consummated, information which will correct previous representations made to the other party which are untrue or misleading." *Id.* at 230.

The Court finds that *Guastella* is of no help to Rogers and Williams. For the reasons discussed previously, McClelland's note did not include a representation about the quantity or value of the Equipment. The Mississippi Supreme Court made it clear that *Guastella* applies "only where [the defendant] misrepresented the facts at the outset and had a duty of disclosure to correct that affirmative falsehood." *See*

---

**33.** Regarding liability for non-disclosure, The RESTATEMENT (SECOND) OF TORTS § 551 states:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

\* \* \*

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and. . . .

*Id.*

*Welsh,* 883 So.2d at 49. Unlike the receipt from the chancery clerk's office, the note in this matter was not preceded by a statement that misled Rogers and Williams, and, therefore, there is no prior statement that triggered a duty upon McClelland to disclose the Heller Lease.

The Court's findings (1) that McClelland's note did not constitute a misrepresentation of fact and (2) that since no prior representation was made to Rogers or Williams, CIT did not have a duty of disclosure to correct any prior representation about the CIT Lease, are fatal to Rogers' and Williams' claims for intentional or fraudulent misrepresentation and, therefore, these findings alone render it unnecessary for the Court to consider the remaining elements of their claims. Nevertheless, the Court will do so in order to promote judicial economy in the event of an appeal. Before leaving this discussion, the Court, however, notes that *Guastella* is factually distinguishable for an additional reason. Unlike the developer in *Guastella,* McClelland did not know *before* the consummation of the CIT Lease about the Double–Leased Equipment. The basis for this finding is discussed in the following section. McClelland's knowledge warrants its own discussion because proof that McClelland knew that the representation was false constitutes a separate required element of Rogers' and Williams' misrepresentation claims that they also failed to establish at Trial.

### c. When Did McClelland Actually Know About the Double–Leased Equipment?

■ Rogers and Williams claim that McClelland knew about the Double–Leased Equipment before the letters of credit issued—one on December 22, 2001

and the other on December 27, 2001, which occurred a few days before the closing of the CIT Lease. (P–18, P–19). CIT insists, on the other hand, that McClelland did not know about the Double–Leased Equipment until some time in April 2002. The Court finds from the evidence presented at Trial that McClelland actually knew about the Double–Leased Equipment no earlier than January 25, 2002. The Court will begin its analysis by first examining the evidence presented by Rogers and Williams on this issue.

The deposition testimony of CIT's employees establish that CIT is a sophisticated, national lender that has been the source of financing and leasing capital for companies in various industries for many years and, no doubt, has had vast experience in sale/leaseback transactions. Rogers and Williams rely on these undisputed facts to show that CIT knew that it was an industry standard for the lender (as opposed to the borrower) to shoulder the responsibility for obtaining clear title to equipment that it purchased in such transactions. Rogers and Williams also rely on the Trial testimony of their attorneys, Painter and Fielder,[34] who advised them during the Sale/Leaseback Transaction. Both Painter and Fielder opined that the industry standard in commercial lending, as well as the customary practice, dictates that the lender accept responsibility for performing UCC lien searches to determine whether collateral securing a transaction is unencumbered. BCR's Echiburu testified that he thought so, too.

Rogers and Williams point out that CIT had plenty of time between the summer of 2000, when McClelland and Beyhan visited BCR's plants, and December 28, 2000,

---

**34.** Painter and Fielder testified at Trial as lay and expert witnesses for Rogers and Williams. With respect to the CIT Lease, Rogers and Williams waived the attorney-client privilege for the period from January 1, 2000 through June 30, 2001. (P–121).

when the CIT Lease closed, to perform UCC lien searches. During that period of time, Lucroy at BCR sent CIT a list of the proposed equipment. (P–1). On October 24, 2000, Loeb delivered to CIT a copy of the 2000 Loeb Appraisal, which included the Equipment originally selected by Lucroy. The Equipment was identified by brands, models, and serial numbers. (P–7). According to Rogers and Williams, McClelland found the time to perform other tasks in the months that followed in the name of "due diligence," such as meeting with some of BCR's Senior Lenders to gauge CIT's risk in the transaction. (P–134B). Yet, according to Robinson at CIT, the process of determining whether some of the Equipment had been double leased was uncomplicated and, therefore, not time-consuming. As it turned out, the existence of the Heller Lease was clearly reflected in UCC–1 financing statements filed with the Office of the Chancery Clerk of Scott County and the Mississippi Secretary of State's Office on January 5, 2000, eleven months before the execution of the CIT Lease. (P–23; P–24). The January 5, 2000, UCC–1 filings included information about the brands, models, and serial numbers of the equipment subject to the Heller Lease, the same information that CIT itself admitted to later using to verify that some of the items of the Equipment had been double leased. (P–23, P–24).

Finally, Rogers and Williams point to a note written on a Lease Transaction Receipt in CIT's files as direct evidence that CIT conducted lien searches *before* the closing of the CIT Lease. The note states: "Follow for updated lien searches. Don't release $1mm holdback until AVP or VP credit authorizes." (P–134I). Rogers and Williams claim that the note indicates that the Second Letter Agreement required BCR to perform only "updated" lien searches *after* the closing in order for CIT to release the $1,000,000.00 Holdback, so

CIT must have performed "initial" lien searches sometime *before* the closing.

As mentioned previously, CIT contends that it did not know about the Double-Leased Equipment until April, 2002, when Robinson was able to verify and conclusively determine that ten items of Equipment were subject to the Heller Lease. CIT points out that the CIT Lease named BCR as the party responsible for confirming title and ownership of the Equipment, and that the Second Letter Agreement expressly contemplated that BCR would perform the necessary lien searches *after* the closing of the CIT Lease. Moreover, consistent with the Second Letter Agreement, the UCC lien searches on the Equipment were in fact completed by BCR on January 3 and January 8, 2001, well *after* the closing of the CIT Lease on December 28, 2000.

CIT contends that the purpose of the $1,000,000.00 Holdback was to allow for the UCC lien searches to take place after the closing so that the closing could move forward without delay, the goal being to complete the transaction before the end of the year as required by the Senior Lenders. According to CIT, Rogers and Williams were aware before the closing of the timing of the lien searches because of the direct involvement of Fielder, their attorney, in drafting the Second Letter Agreement. Fielder provided handwritten comments to his co-counsel, Painter, and to counsel for BCR, on drafts of what later became the Second Letter Agreement. (CIT–17, CIT–104).

The Court finds that the evidence at Trial does not support the position of either Rogers and Williams or of CIT. The Court concludes that McClelland actually knew about the Double-Leased Equipment no earlier than January 25, 2002. When Koch informed Echiburu in late De-

cember 2001 or early January 2002 of the possibility that some equipment in its plants may have been double leased by BCR, Echiburu brought the issue to the attention of Painter and CIT's McClelland by telephone shortly thereafter. It was not until January 25, 2002, however, when Koch sent CIT a facsimile listing items of Equipment that it believed may have been double leased that CIT actually became aware of the issue specifically as to the CIT Lease. Although it was not until much later, in April 2002, that Robinson verified Koch's assertion, the issue had been raised sufficiently prior to that date to place the Equipment List in doubt by January 25, 2002. Then, at Painter's specific request, CIT advised Rogers and Williams about what it knew regarding the double-leasing issue in a letter dated June 20, 2002.

Although the Court agrees with Rogers and Williams that the timing of the UCC lien searches, because they were performed *after* the closing, is not typical in sale/leaseback transactions, it is the CIT Lease that is relevant here, and not some imaginary lease that conforms to industry standards by requiring lien searches *before* the closing. Likewise, it is when the lien searches actually took place that is relevant here, and not whether CIT had sufficient time to complete the lien searches any earlier than that date. The evidence at Trial showed that the lien searches were actually conducted on January 3 and January 8, 2001, and were not merely "updated" lien searches but were comprehensive searches that covered five years prior to the date of the CIT Lease. None of the lien searches referred to any prior searches having been conducted by BCR or CIT outside the parameters of the Second Letter Agreement.

The only concrete evidence offered by Rogers and Williams in support of their position that McClelland actually knew before the closing about the Double–Leased Equipment is the Lease Transaction Report. According to CIT's Beyhan, however, the Lease Transaction Report was an internal document prepared by an employee in the operations department, rather than someone involved in the negotiation and consummation of the CIT Lease. Its reference to "updated" lien searches contradicts not only the Second Letter Agreement, but also subsequent events and was likely the result of a reflexive mistake by an employee performing a clerical task.

In short, the Court rejects Rogers and Williams' supposition that because it is typical for the lender in a sale/leaseback transaction to conduct lien searches and for lien searches to be completed *before* a loan closing, and because a note written by an operations employee mentions "updated" rather than initial lien searches, McClelland, and, therefore, CIT knew about the Double–Leased Equipment before the closing and before Rogers and Williams issued their letters of credit. Rogers and Williams' position is untenable given how CIT and BCR structured the Sale/Leaseback Transaction.

**d. Did McClelland Intend for Rogers or Williams to Rely on the Note to Induce Them to Provide the Letters of Credit?**

■ The Court finds that Rogers and Williams failed to produce sufficient evidence at Trial showing that McClelland intended to induce them to provide the letters of credit by faxing the Equipment List to Fielder. Their inability to prove this element of their misrepresentation claims is another finding that entitles CIT to judgment in its favor.

It was undisputed at Trial that McClelland did not send the Equipment List to Fielder unsolicited. Fielder called McClelland and specifically requested a list of the

equipment. According to McClelland's deposition testimony, he believed that Fielder represented BCR, not Williams, when he complied with Fielder's request and faxed him the Equipment List. Fielder's actions after he received the Equipment List are consistent with why he requested it, and why McClelland sent it to him. Upon receipt, Fielder transmitted the Equipment List to Lott, who was BCR's counsel, and to Llorens, who was the Senior Lenders' counsel, on December 22, 2000, for the stated purpose of facilitating the filing of UCC–3s related to the releases of the Equipment as collateral by the Senior Lenders and by Rogers and Williams.

Also, McClelland could not have reasonably contemplated that Williams or Rogers would have based their decision to provide the letters of credit on his note because their interests were adverse to CIT's. The Equipment functioned as collateral to the debt BCR owed both Rogers and Williams and CIT, and, thus, they had competing interests in the Equipment. Rogers and Williams' contentions that it was incumbent upon CIT to verify for itself, and for their benefit, that title to all of the Equipment was clear, lacks support in the record. Rogers and Williams, both of whom are sophisticated businessmen, cannot shift the burden onto CIT to protect their interests in a manner that was not reflected in

any of the written documents that structured the Sale/Leaseback Transaction.

### e. When Did Rogers and Williams Know About the Double–Leased Equipment?

■ On January 3, 2001, BCR forwarded copies of the letter it had sent to McClelland, to Fielder and to Painter. Fielder, but not Painter, recalled receiving copies of the post-closing lien searches as enclosures in the letter, including the UCC–1 filing that disclosed the Heller Lease. Because Fielder's knowledge is imputed to Rogers and Williams, the Court finds that they became aware of the Double–Leased Equipment shortly after the closing of the CIT Lease.[35]

■ Their knowledge about the Double–Leased Equipment on or shortly after January 3, 2001, defeats their claims for misrepresentation based on CIT's alleged duty to disclose the Heller Lease after that date. The law does not impose upon CIT a greater duty to protect Rogers' and Williams' interests than they do themselves.[36]

### f. Did Rogers and Williams Reasonably Rely on McClelland's Note?

■ CIT contends as a preliminary matter that Rogers cannot establish the element of reliance because Rogers, unlike

**35.** An invoice sent to Painter suggests that lien searches were performed on behalf of Rogers and Williams as early as December 18, 2000, which was after McClelland had faxed the Equipment list to Fielder but before the closing of the CIT Lease. (CIT–126). The invoice was not explained at Trial and by itself does not establish Rogers' and Williams' knowledge of the Heller Lease by that date.

**36.** According to Rogers and Williams, the duty to disclose the Heller Lease continued well after the CIT Lease closed on December 28, 2000. Rogers and Williams cite no authority for their position, and the Court

notes that the duty exists under § 551 of the RESTATEMENT (SECOND) OF TORTS *"before* the transaction is consummated."* In any event, Rogers and Williams cannot show that they sustained any damages as a proximate result of CIT's alleged failure to disclose the Heller Lease any time *after* the delivery of their letters of credit to CIT because at that juncture, Rogers and Williams could not have prevented CIT from drawing under the letters of credit pursuant to the CIT Lease. *See Glover v. Jackson State Univ.,* 968 So.2d 1267, 1277 (Miss.2007).

Williams, did not review McClelland's note or the attached Equipment List before he agreed to provide the letter of credit. While the Court does find that neither Rogers nor Williams reasonably relied on McClelland's note, the Court does not agree with the distinction CIT draws between them. Painter represented Williams with regard to the Sale/Leaseback Transaction and was his agent under familiar principles of agency law. The evidence at Trial established that Williams, in turn, was Rogers' agent. In that regard, Rogers and Williams testified at Trial that they had agreed that in the Sale/Leaseback Transaction, their economic interests were substantially the same and so had further agreed that Williams would negotiate their collective interests, subject to Rogers' right to consult with his own legal counsel if their interests ever diverged. Their goal was to simplify negotiations in order to expedite the Sale/Leaseback Transaction, which Painter testified had an end-of-the-year deadline. Consistent with their agreement, both Rogers and Williams conferred regularly with Painter and both paid one-half of Painter's attorney's fees and expenses. They also testified that they both relied on his advice in agreeing to provide the letters of credit at issue.

Finally, that Williams was Rogers' agent was also evidenced by how CIT itself treated them during the negotiations and closing of the Sale/Leaseback Transaction. CIT sent all paperwork for both Rogers and Williams solely to Painter.

In support of its opposing view, CIT relies upon an unsigned memorandum that appears to be an attempt by Painter to memorialize the understanding between Rogers and Williams (and to assure payment of his attorney's fees and expenses). The opening paragraph of the memorandum states, "Recognizing that Mr. Painter represents me as my personal attorney in this matter, I also understand that you agree for me to represent your interests in this matter." (P–132). CIT cites a provision in the second numbered paragraph of the memorandum that appears to conflict with the above statement: "Your authorization for me to represent our collective interests does not constitute a power-of-attorney or any other agreement which would result in a principal and agent relationship or any other similar arrangements." (P–132).

As an unsigned draft, the memorandum has no binding effect. *Butler v. Bunge Corp.*, 329 F.Supp. 47, 58 (N.D.Miss.1971) (court can disregard effect of provisions that negate agency when circumstances indicate otherwise). Moreover, the absence of a signed, written agreement does not preclude this Court from finding an implied agency relationship. *See Alley v. Miramon*, 614 F.2d 1372, 1382 (5th Cir.1980) (implied agency relationship may exist in the absence of a written agreement). It is their conduct that is the touchstone of the agency issue. *Esso Int'l, Inc. v. SS Captain John*, 443 F.2d 1144, 1147–48 (5th Cir.1971).

For the reasons stated previously, the Court finds ample evidence supporting the presence of an implied agency relationship between Rogers and Williams. Rogers, therefore, is not required to show that he personally reviewed McClelland's note and the attached Equipment List in order to establish his misrepresentation claim if Williams can establish that he did so through his agent Painter. As his agent, Williams' knowledge equates to Rogers' knowledge. *Lane v. Oustalet*, 873 So.2d 92, 95–96 (Miss.2004) (agent's knowledge and information is imputed to principal).

The Court next discusses why the evidence at Trial established that Rogers and

Williams did not reasonably rely on McClelland's note.

■ Rogers and Williams point out that the "new price" of the Double–Leased Equipment approaches $1,000,000.00, a fourth of the "new price" of all the items reflected on the Equipment List. They testified at Trial that if they had known that items having an original invoice price of nearly $1,000,000.00 were unavailable to secure the CIT Lease, they would not have caused the letters of credit to issue at all. As a preliminary matter, CIT takes issue with Rogers and Williams' reference to the "new price" of the Double–Leased Equipment, rather than to its depreciated value, which according to the 2000 Loeb Appraisal was $475,500 as of October 24, 2000. The Court disagrees with CIT because it is the proportionate amount of Double–Leased Equipment that is relevant, regardless of which value is used to arrive at that figure. The Court finds the proportionate amount is sufficiently significant to support Rogers' and Williams' testimony that they would not have accepted the financial risk if they had known about the true quantity of the Equipment.

The Court does agree with CIT, however, that because the UCC lien searches had not yet been completed by BCR at the time McClelland sent his note, and, more important, were not expected to be completed by BCR before the closing of the CIT Lease, Rogers and Williams have failed to show that they reasonably relied on McClelland's note. Painter and Fielder were aware of the timing of the lien searches because: (1) Fielder provided handwritten edits and comments to Lott, counsel for BCR, on December 28, 2000, on drafts of what became the Second Letter Agreement (CIT–17, CIT–104); (2) Fielder provided handwritten edits and comments to CIT on December 20, 2000, on a draft of the CIT Lease; (3) Painter reviewed the final version of the CIT Lease before it was executed by CIT and BCR (P–53); and (4) Fielder wrote CIT a letter on January 9, 2001, in which he remarked that CIT would have sufficient information to release the $1,000,000.00 Holdback by Wednesday of that same week. (CIT–29). Their involvement shows that they knew, and that Rogers and Williams knew, that UCC lien searches would not be completed until *after* the execution of both the CIT Lease and the Loan Agreement in which Rogers and Williams committed themselves to provide the letters of credit.

Rogers and Williams insist that it is implausible that CIT would rely on BCR's contractual obligation to provide evidence of clear title to the Equipment before it agreed to buy it. The evidence shows, however, that CIT did not rely alone on BCR's contractual obligation in the CIT Lease. CIT made provisions for the risk that the lien searches performed after the closing might reveal problems in the title to the Equipment by releasing only $3,000,000.00 of the $4,000,000.00 to BCR at the closing. Painter and Fielder admitted that they knew about the $1,000,000.00 Holdback but suggest that this provision was included as an amendment to the CIT Lease to provide CIT with a financial cushion in the event the partial releases were not filed. The two letter agreements, however, are not limited to partial releases. Moreover, as noted previously, CIT did not rely solely on the Equipment as collateral for the CIT Lease. Because CIT viewed the Equipment at its distressed value of $1,600,000.00 in gauging its risk, CIT's Beyhan required letters of credit as additional collateral. Likewise, Rogers and Williams did not rely solely on the value of the Equipment but required BCR to provide them with liens on its assets. (P–134B).

Finally, Rogers and Williams are astute businessmen and former owners of BCR who were represented by competent counsel. This amplifies the unreasonableness of their reliance on McClelland's note without any other confirmation. They certainly had the opportunity to search the applicable UCC filings and to discover the Double–Leased Equipment on their own.

## 2. Negligent Misrepresentation

 Unlike intentional misrepresentation and fraud, negligent misrepresentation does not require evidence of an intent to deceive or defraud. *Berkline Corp. v. Bank of Miss.*, 453 So.2d 699, 702–03 (Miss.1984). The elements of negligent misrepresentation, which must be proven by a preponderance of the evidence, are: (1) a misrepresentation or omission of a fact, (2) that the representation or omission is material or significant, (3) that the person charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such parties, (4) that the plaintiff reasonably relied upon the misrepresentation or omission, and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance. *Waggoner v. Williamson*, 8 So.3d 147, 155 (Miss.2009); *Shogyo Int'l Corp. v. First Nat'l Bank*, 475 So.2d 425, 428 (Miss.1985). The third element is what distinguishes negligent misrepresentation from intentional or fraudulent misrepresentation.

In rejecting Rogers and Williams' claims for intentional or fraudulent misrepresentation, this Court concluded, among other things, that McClelland's note did not constitute a misrepresentation of fact and that Rogers and Williams did not Rely on McClelland's note. These conclusions also entitle CIT to judgment in its favor as to Rogers' and Williams' negligent misrepresentation claims. There are, however, two additional matters that the Court has not previously addressed that merit brief discussion: first, when should McClelland have known about the double-leased equipment if he had exercised reasonable care?, and second, do the UCC filings, because they are public records, render Rogers' and Williams' reliance on McClelland's note unreasonable?

### a. When Should McClelland Have Known about the Double–Leased Equipment?

The Court finds that the evidence at Trial establishes that McClelland should have known about the Double–Leased Equipment no earlier then January 3, 2001, when BCR sent a letter to McClelland that included a copy of the financing statement filed by Heller Financing Leasing, Inc. in Scott County. The note in CIT's files dated December 26, 2001, upon which Rogers and Williams rely as additional evidence that McClelland should have known before the CIT Lease was deemed rejected, if not earlier, is insufficient to meet Rogers' and Williams' burden of proof, because BCR and CIT were parties to eleven different leases, including the one in dispute here, and the note does not identify which of those multiple leases was at risk. Moreover, the note—"Maybe double fin. one lease"—is equivocal, reflecting an opinion, rather than a definitive statement. (P–25).

### b. Do the UCC Filings, Which Are Public Records, Render Rogers' and Williams' Reliance Unreasonable?

 CIT asserts that Rogers and Williams cannot show that they reasonably relied on McClelland's note because the information regarding the Double–Leased Equipment was equally available to them as a matter of public record. *See Bedard v. Martin*, 100 P.3d 584, 592 (Colo.Ct.App. 2004); *O'Brien v. Noble*, 106 Ill.App.3d 126, 61 Ill.Dec. 857, 435 N.E.2d 554, 557

(1982) (holding that the synthesis of authorities in its jurisdiction "appears to be that liability will be found when the defendant misrepresents facts of which he possesses almost exclusive knowledge, the truth of falsity of which are not readily ascertainable by the plaintiff"); *Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp.*, 4 F.Supp.2d 1198, 1205 (S.D.Ga. 1998) (holding that in an arms-length business transaction, there is no obligation to disclose information that is equally available to the plaintiff), *aff'd sub nom. Duffryn v. Calgon Carbon*, 176 F.3d 494 (11th Cir.1999). The UCC filings evidencing the Heller Lease were a matter of public record as of January 5, 2000, which was well before McClelland sent his note to Fielder. In *St. Paul*, the Fifth Circuit recognized that "[t]he law does not favor the indifferent, unseeing surety who fails to help himself." *St. Paul*, 646 F.2d at 1072.

Rogers and Williams counter that the fact that the UCC filings were public records does not render their reliance on McClelland's note unreasonable. In support of their position, they cite two decisions from the Mississippi Supreme Court, *Guastella* and *Green Realty Mgmt. Corp. v. Miss. Transp. Comm'n*, 4 So.3d 347, 352 (Miss.2009). In *Guastella*, the facts of which this Court has already discussed, the Mississippi Supreme Court held that "fraud may be predicated on false representations or concealments, although the truth could have been ascertained by an examination of public records." *Guastella*, 198 So.2d at 230–31. The *Guastella* court, however, also noted that the purchaser did not have a reasonable opportunity to check the public record for the restrictive covenants before the loan closing, a fact that is not present here and that renders *Guastella* inapposite. The second decision relied upon by Rogers and Williams, *Green Realty*, involved the sale of two tracts of undeveloped land to the Mississippi Transportation Commission ("MTC") in connection with a road-widening project. The seller, Green Realty Management Corp. ("Green Realty"), did not know that MTC intended to replace an existing culvert with a new, larger, box culvert. Once construction of the new culvert began, Green Realty undertook extensive measures to protect its adjacent property from flooding and sued MTC for misrepresentation. The basis for Green Realty's claim was MTC's failure to disclose its intention to replace the existing culvert in the maps or in the offers it provided Green Realty during their negotiations. On appeal of an award of summary judgment, the Mississippi Supreme Court ruled that Green Realty presented evidence sufficient to raise material fact issues for trial. Notably, the Court held that the existence of publicly-recorded documents did not absolve MTC of its duty to disclose its construction plans. This Court, however, finds *Green Realty* distinguishable because MTC's maps and offers, unlike McClelland's note, constituted previous misrepresentations.

## B. Civil Conspiracy

Rogers and Williams allege that CIT conspired with Koch to defraud them by allowing Koch to use the Equipment at less than fair market value or by allowing Koch to purchase the Equipment for less than its fair market value. They insist they were defrauded of their letters of credit because proceeds from the sale of that Equipment would reduce the amount owed by BCR under the CIT Lease which, in turn, would reduce the amount CIT could draw on their letters of credit.

 Conspiracy in the civil context requires a finding of: "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action;

(4) one or more unlawful overt acts; and (5) damages as the proximate result." *Gallegos,* 956 So.2d at 1060; *see also Shaw v. Burchfield,* 481 So.2d 247 (Miss.1985). The key to a finding of conspiracy is proof that the parties had an agreement, either to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully. *Gallagher Bassett Servs. v. Jeffcoat,* 887 So.2d 777, 786 (Miss.2004). CIT disputes all but the first element of Rogers and Williams' conspiracy claim.

### 1. What Object Did CIT and Koch Accomplish?

The object to be accomplished, according to Rogers and Williams, was for Koch to use the Equipment without charge and for CIT to retain the proceeds from the letters of credit without having to account for the Equipment's value. Rogers and Williams also allege that an additional goal was to strengthen CIT's negotiation stance with Koch. The Court finds that the evidence presented at Trial did not support these allegations for the reasons set forth in the discussion below regarding the lack of evidence of any unlawful overt act.

### 2. Was There a Meeting of the Minds Between CIT and Koch?

It is undisputed that no direct evidence was presented at Trial of any actual agreement between CIT and Koch. Rogers and Williams nevertheless insist that some meeting of the minds between CIT and Koch had to have occurred. *See Gallagher,* 887 So.2d at 786 (acknowledging that tacit agreement may suffice for conspiracy); *see Wagley v. Colonial Baking Co.,* 208 Miss. 815, 45 So.2d 717 (1950) (recognizing that the "law permits great latitude in the admission of circumstantial evidence to establish a conspiracy, and to connect those advising, encouraging, aiding, abetting and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy"). The Court finds that Rogers and Williams have failed to support their bald assertion either by direct or circumstantial evidence. There was no evidence of a conspiracy to defraud Rogers and Williams, rather, the evidence revealed multiple communications between CIT and Koch as they engaged in lengthy, step-by-step negotiations over the sale of CIT's equipment. That evidence is reviewed briefly below.

In January 2002, shortly after the automatic stay had lifted, Mulgrew at CIT began negotiations for the sale of the Equipment. CIT concluded at the outset that Koch, as the purchaser of BCR's plants and as the only potential in-place buyer, would likely pay more for the Equipment than anyone else, largely because any other buyer would have to absorb the cost of removing and transporting the Equipment to another location. This conclusion was also reached by the appraiser, Newman. The progression of these negotiations is evidenced by a series of facsimiles, notes, and letters.

A facsimile sent by CIT's Mulgrew on January 9, 2002, to Nuckolls at Koch, stated that CIT was "anxious to start securing these assets" but "would be happy to consider any sales offers" from Koch. (P–134Q). Nuckolls responded on January 25, 2002, by faxing Mulgrew a list of equipment that Koch was interested in purchasing. (P–75; CIT–106). After a conference call with Mulgrew, CIT's Jones wrote on January 28, 2002, near the bottom of the cover sheet to Nuckolls' facsimile of January 25, 2002, "Offer is around 350,-0[00]. To[o] low to accept. Asset Management to follow through w/ repo." (P–75; CIT–42, CIT–44).

On February 21, 2002, CIT sent Koch a letter noting that sales negotiations were ongoing but requesting that Koch pay rent

for its use of the Equipment for the months of January and February, 2002. (P–36). This letter led to Koch's offer on March 4, 2002, relayed by Nuckolls to Mulgrew, to purchase all of the Equipment, except for eighteen items, for $1,250,000.00. A note in the handwriting of CIT manager, Robinson, dated April 19, 2002, consists of a list of talking points to use in his discussions with Koch's CEO, Grendys, to persuade him to increase Koch's offer. (P–78). Robinson forwarded to Grendys a chart that he had prepared from the EEC Appraisal that showed the value of the equipment, not including the value of the double-leased and unwanted equipment. Grendys testified in his deposition that CIT was "aggressive" during the negotiations.

Finally, Rogers and Williams' contention that CIT's secondary goal was to strengthen its negotiation stance with Koch, is inconsistent with the existence of a common intent between them to conspire against Rogers or Williams. In short, there is no evidence of any agreement, either tacit or open, between CIT and Koch to conspire against Rogers and Williams.

### 3. What Was the Unlawful Overt Act?

 Liability for civil conspiracy depends on performance of some underlying tortious act. Rogers and Williams alleged that the unlawful overt act was Koch's use of the Equipment, the collateral subject to the CIT Lease, from January 1, 2002 until October 8, 2002, without payment of rent. They point out that BCR paid CIT $71,551.56 per month in rent for the same Equipment. This Equipment was essential to Koch's poultry operations, just as the Equipment had been essential to BCR's. Indeed, Koch confirmed that it would have replaced the Equipment if CIT had repossessed it. Given these facts, Rogers and Williams ask two questions that are central to their conspiracy claims: why did CIT not immediately repossess the Equipment once the CIT Lease was deemed rejected?, and why did CIT allow Koch to use the Equipment without requiring Koch to pay the same rent BCR paid?

Robinson, a CIT manager, testified in his deposition that in telephone calls with Grendys at Koch on April 19, 2002, or shortly thereafter, he did seek compensation for Koch's use of the Equipment, which is evidenced by a note in his handwriting. (CIT–147, Ex. 25). Moreover, Koch eventually did agree to pay CIT $49,057.50 as additional compensation for its use of the Equipment during the months they were negotiating the final purchase price. (P–101). An email from McDermid, the CIT manager in charge of the asset management department, to Robinson on September 3, 2002, states, "I ran the numbers using a 9/13/02 closing date. They will pay us $49,057.50 on closing and the pymts [sic] will be $31,630.84 for 48 mths [sic] effective 10/13/02." (CIT–108). The additional amount of $49,057.50 is equivalent to six months of interest at a rate of 7.5%. McDermid testified in his deposition that this amount was reasonable and CIT did not want to appear too "greedy" given the price Koch had agreed to pay for the Equipment.

Rogers and Williams compare the "interest" payment of $49,057.50 with BCR's monthly rental fee of $71,551.56 and dismiss it as CIT's attempt to conceal its conspiracy with Koch. They point out that it equates to Koch paying CIT a rental amount of only about $4,900.00 per month.

The Court finds that Rogers and Williams have failed to show that CIT and Koch conspired to commit an unlawful overt act. CIT did not strictly consider

the additional payment of $49,057.50 an "interest" payment, especially in light of what CIT considered to be an excellent sales price for the Equipment. (P–103). Moreover, according to Nuckolls, Koch did not pay rent to any equipment lessors, other than CIT. Finally, as CIT notes, the Equipment at the plants belonged to CIT, and under the CIT Lease, only CIT had the right to dispose of the Equipment in the event of a default by BCR.

In short, the burden of proof was on Rogers and Williams to show that CIT and Koch entered into an agreement to accomplish an unlawful purpose or to accomplish any lawful purpose unlawfully. There is no evidence that there was any such agreement between CIT and Koch. Instead, the evidence establishes that CIT and Koch reached an agreement for the sale of the Equipment as the result of arms-length negotiations. In addition, Rogers and Williams failed to present any evidence showing a viable, underlying civil wrong or tort.

### C. Breach of the CIT Lease

Although Rogers and Williams were not parties to the CIT Lease, they seek damages arising out of CIT's alleged breaches of the CIT Lease. They contend that CIT violated the covenant of good faith and fair dealing, breached its duty to dispose of the Equipment in a commercially reasonable manner, and breached its obligations concerning the timing of draws under the letters of credit. In order to assert these contract claims, Rogers and Williams contend that they had surety relationships with CIT and BCR and that they are subrogated to BCR's rights under the CIT Lease.

### 1. Does the Independence Principle Bar Rogers and Williams from Asserting Subrogation Rights Against CIT?

In the *Memorandum Opinion* (Adv. Dkt. No. 354) denying partial summary judgments motions filed by CIT, this Court ruled that the "independence principle," as developed under letter of credit law, did not preclude Rogers and Williams from stepping into BCR's shoes to assert claims against CIT for alleged breaches of the CIT Lease. *See Rogers v. The CIT Group/Equipment Financing, Inc. (In re B.C. Rogers Poultry, Inc.)*, No. 03–00122–EE, 2009 WL 3856428 (Bankr.S.D.Miss. Nov. 16, 2009). The Court rejects CIT's contention that their status as applicants for letters of credit in the Sale/Leaseback Transaction, precluded Rogers and Williams from asserting equitable subrogation rights against CIT.

In the CIT Brief, CIT renews its assertion that Rogers and Williams may only be subrogated under the circumstances set forth in Miss.Code Ann. § 75–5–117(b), which does not specifically allow an applicant to subrogate to an account party's rights in the underlying contract against the beneficiary. The Court, however, has already rejected CIT's contention in the *Memorandum Opinion*, and even if it were inclined to reconsider its decision, the law-of-the-case doctrine prevents this Court from revisiting that legal issue. *Pritchard v. U.S. Tr. (In re England)*, 153 F.3d 232, 235 (5th Cir.1998) (noting that a court follows its prior final decisions in the case as the law of that case). For the sake of clarity, however, the Court will digress briefly to explain the basis for its previous decision.[37]

A letter of credit is an engagement by an issuer, usually a bank, made at the

---

**37.** Some of the language in this section is lifted directly from the *Memorandum Opinion.*

request of a customer (or applicant) for a fee, to honor a beneficiary's drafts or other demands for payment upon satisfaction of the conditions set forth in the letter of credit. Miss.Code Ann. § 75–5–102.[38] At common law, the issuer of a letter of credit had a direct obligation to pay independent of the underlying contract between the customer and the beneficiary as long as the documents presented satisfied the terms of the letter of credit. *See, e.g., Pringle Associated Mortg. Corp. v. S. Nat'l Bank,* 571 F.2d 871, 874 (5th Cir.1978). This feature of a letter of credit is known as the "independence principle" and has been described as the "most unique and mysterious part of the letter of credit transaction." 3 James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 26–2 (5th ed.2007). The independence principle is what distinguishes a letter of credit from other payment devices. In Mississippi, the independence principle is codified in Miss.Code Ann. § 75–5–103(d), which states:

> Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary. `

*Id.*

■■■ In the past, courts have disagreed about whether to apply the common-law doctrine of equitable subrogation in the context of letters of credit. The doctrine of equitable subrogation, as defined by the United States Supreme Court in *American Surety Co. v. Bethlehem National Bank,* 314 U.S. 314, 317, 62 S.Ct.

226, 86 L.Ed. 241 (1941), is "[a]mong the oldest ... doctrines is the rule of subrogation whereby 'one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other.'" *Id.* One of the many prerequisites to equitable subrogation is that the party who seeks the benefit of subrogation not be primarily liable for the debt that the party paid. *St. Paul Prop. & Liab. Ins. Co. v. Nance,* 577 So.2d 1238, 1241 (Miss.1991). Some courts have held that because an issuer of a letter of credit is primarily liable—in that a letter of credit imposes an independent duty to pay—an issuer *is not* entitled to equitable subrogation. *In re Agrownautics, Inc.,* 125 B.R. 350 (Bankr.D.Conn.1991). Other courts have held to the contrary: that because an issuer is secondarily liable-in that its duty to pay does not arise until after a party to the underlying transaction has defaulted—an issuer *is* entitled to equitable subrogation. *In re Valley Vue Joint Venture,* 123 B.R. 199 (Bankr.E.D.Va.1991).

■■ In 1996, Mississippi adopted revisions to Article 5 of the Uniform Commercial Code governing letters of credit, as drafted by the National Conference of Commissioners on Uniform State Laws (NCCUSL) and the American Law Institute (ALI). *See* John M. Czarnetzky, *Symposium on the Uniform Commercial Code: Article: Modernizing Commercial Financing Practices: The Revisions to Article 5 of the Mississippi UCC,* 66 Miss. L.J. 325 (1996). The revisions to Article 5 resolved the subrogation question in letter of credit transactions in favor of applicants and issuers, as follows:

> (a) An issuer that honors a beneficiary's presentation is subrogated to the

---

**38.** The CIT Lease does not contain a choice of law provision. All parties apparently agree that this transaction is governed by Mississippi law.

rights of the beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.

(b) An applicant that reimburses an issuer is subrogated to the rights of the issuer against any beneficiary, presenter or nominated person to the same extent as if the applicant were the secondary obligor of the obligations owed to the issuer and has the rights of subrogation of the issuer to the rights of the beneficiary stated in subsection (a).

Miss.Code Ann. § 75–5–117. As revised, Miss.Code Ann. § 75–5–117 explicitly places an applicant who has paid an issuer of a letter of credit in the same position as if that person were a guarantor. This revision overruled *Tudor Development Group, Inc. v. United States Fidelity & Guaranty Co.*, 968 F.2d 357, 362 (3d Cir. 1992), in which the Third Circuit Court of Appeals denied an issuer of a letter of credit the right to seek subrogation on the ground that an issuer's obligation under a letter of credit was "primary," whereas a guarantor's obligation was "secondary." *Tudor Dev. Group, Inc.*, 968 F.2d at 362. Instead, Miss.Code Ann. § 75–5–117 embraces the view of the dissenting opinion in *Tudor Development Group, Inc.* that a letter of credit issuer is functionally the same as a guarantor, and accordingly is entitled to equitable subrogation to the same extent as a secondary obligor. *Tudor Dev. Group, Inc.*, 968 F.2d at 364–71 (Becker, J., dissenting) (denying equitable subrogation after payment of letter of credit would amount to pointless formalism).

In short, Miss.Code Ann. § 75–5–117 removes the independence principle as a basis for denying equitable subrogation.

Notably, subsection (d) of Miss.Code Ann. § 75–5–117 maintains the integrity of the independence principle, and thus the usefulness of letters of credit in the world of commercial financing, by conferring subrogation rights only *after* a beneficiary has been paid:

(d) Notwithstanding any agreement or term to the contrary, the rights of subrogation stated in subsections (a) and (b) do not arise until the issuer honors the letter of credit or otherwise pays.... Until then, the issuer, nominated person and the applicant do not derive under this section present or prospective rights forming the basis of a claim, defense or excuse.

Miss.Code Ann. § 75–5–117. In this way, subsection (d) eliminates the concerns of the financial world provoked by the almost universally criticized decision in *Twist Cap, Inc. v. Southeast Bank of Tampa (In re Twist Cap, Inc.)*, 1 B.R. 284 (Bankr. M.D.Fla.1979), in which the court enjoined an issuer's payment of three letters of credit as voidable preferences. In doing so, *Twist Cap* frustrated the commercial purpose of a letter of credit as a quick and easy payment device. The principle reflected in Miss.Code Ann. § 75–5–117, which has been described as "pay now; argue later," protects the interests of the lending community by requiring the issuer to honor the beneficiary's right to payment as an initial matter without reference to the underlying contract.

Moreover, CIT in the CIT Brief makes too much of the omission in the statute granting an applicant subrogation rights against a beneficiary. Typically, a standby letter of credit transaction is a three-party arrangement involving two contracts and the letter of credit. The three parties are: (1) the party who owes performance (the account party) and who procures the letter of credit (the applicant), (2) the party (usu-

ally a bank) who issues the letter of credit (the issuer), and (3) the party to whom performance is owed (the beneficiary). *Resolution Trust Corp. v. United Trust Fund, Inc.,* 57 F.3d 1025, 1030 (11th Cir. 1995). The first contract, between the applicant and issuer, requires the applicant to reimburse the issuer for any amounts drawn on the letter of credit; the second contract, between the account party (usually also the applicant) and the beneficiary, forms the underlying transaction. 3 James J. White & Robert S. Summers, Uniform Commercial Code § 26–2 (15th ed.2007).

The facts of this case are unusual because the applicants, Rogers and Williams, are not the account parties in the CIT Lease. It is therefore not surprising that the statute does not address the subrogation rights of applicants like Rogers and Williams since they are usually account parties to the underlying transaction. Moreover, Miss.Code Ann. § 75–5–103 specifically recognizes that Article 5 does not act as the exclusive authority over all letter of credit transactions and a statement of a rule "does not by itself require, imply, or negate application of the same or a different rule to a situation not provided for, or to a person not specified in this chapter." [39] *Id.; see Ochoco Lumber Co. v. Fibrex & Shipping Co.,* 164 Or.App. 769, 994 P.2d 793, 795 (2000). Without question, Article 5 is supplemented by statutory and common law:

> Like all of the provisions of the Uniform Commercial Code, Article 5 is supplemented by Section 1–103 and, through it, by many rules of statutory and common law. Because this article is quite short and has no rules on many issues

that will affect liability with respect to a letter of credit transaction, law beyond Article 5 will often determine rights and liabilities in letter of credit transactions. Even within letter of credit law, the article is far from comprehensive; it deals only with "certain" rights of the parties.

UCC § 5–103 cmt. 2.

The Court's conclusion in the *Memorandum Opinion* that the independence principle does not preclude Rogers and Williams from invoking the doctrine of equitable subrogation, was not tantamount to a holding that Rogers and Williams may equitably subrogate to BCR's rights against CIT under the facts presented here. *See Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.,* 303 F.2d 692, 697 (5th Cir.1962) ("Subrogation is not an absolute right which a party paying the debt of another may enforce at will."). Instead, the Court noted in the *Memorandum Opinion* that Rogers and Williams must show that they are entitled to equitable subrogation under Mississippi law based on the equities of this particular case, an issue to which the Court now turns.

### 2. Does the Doctrine of Equitable Subrogation Apply?

 The Court must measure Rogers and Williams' subrogation claim in the same way as the subrogation claim of a secondary party. A standby letter of credit resembles, to a certain extent, a guarantee for another's performance. Subrogation has been defined as "[t]he substitution of one party for another whose debt the

---

**39.** CIT complains in the CIT Brief that the Court omitted three words from Miss.Code Ann. § 75–3–103 in its *Memorandum Opinion* that it contends provide "[a] very weighty limitation to that subsection's applicability."

(CIT Brief at 85). The Court has taken special care to include the previously omitted prepositional phrase "in this chapter," but disagrees with CIT that it adds any significant limitation to the scope of the statute.

party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." *Black's Law Dictionary* 1563–64 (9th ed. 2009). Under Mississippi law, two different types of subrogation exist: (1) equitable subrogation that arises from operation by law, and (2) conventional subrogation that arises from contract. *Union Mortg., Banking & Trust Co. v. Peters,* 72 Miss. 1058, 18 So. 497, 500 (1895). Accordingly, a party who is not a party to a contract may assert a right of equitable subrogation based on the equities of the situation. The doctrine of equitable subrogation applies "whenever any person, other than a mere volunteer, pays a debt or demand which in equity and good conscience should have been paid by another, or where one finds it necessary for his own protection to pay the debt for which another is liable." *First Nat'l Bank of Jackson v. Huff,* 441 So.2d 1317, 1319 (Miss.1983). The principle of equitable subrogation is not reserved only for the rights of a creditor. Indeed, "a surety can be subrogated not only to the rights of the creditor, but also the rights of the principal on whose behalf the surety paid." *In re Big Idea Prods., Inc.,* 372 B.R. 388, 397 (Bankr.N.D.Ill.2007); *see Ellis v. Powe,* 645 So.2d 947, 951 (Miss.1994) ("Subrogation is the substitution of one person in the place of another, whether as a creditor or as the possessor of any rightful claim, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and to its rights, remedies, or securities"); *accord Travelers Indem. Co. v. Clark,* 254 So.2d 741, 745 (Miss.1971); *Oxford Prod. Credit Ass'n. v. Bank of Oxford,* 196 Miss. 50, 16 So.2d 384, 388 (1944). CIT contends that Rogers and Williams' claim fails because (1) the letters of credit did not satisfy the entire debt

owed by BCR, and (2) CIT was not unjustly enriched. The Court agrees.

### 3. Does the "Made–Whole" Rule of Subrogation Apply?

The Mississippi Supreme Court in *Hare v. State,* 733 So.2d 277, 284 (Miss. 1999), adopted the "made-whole" rule of subrogation that renders subrogation unavailable until the debt owed to a subrogor has been paid in full. The underlying rationale for the rule is that the intent of equitable subrogation is to prevent double recovery, which is not at issue until a subrogor has been "made whole." *See Rabo Agrifinance Inc. v. Terra XXI, Ltd.,* 583 F.3d 348, 354 (5th Cir.2009) ("[w]here a surety pays only part of a single debt, he cannot receive rights of subrogation").

CIT contends that the "made-whole" rule applies to Rogers and Williams' subrogation claim because the letters of credit in the amount of $3,000,000.00 did not fully satisfy BCR's debt to CIT under the CIT Lease. It is undisputed that BCR owed CIT at least $4,293,093.60, which is the sum of all monthly rent payments due. CIT contends that BCR owed it even more than that amount because of late charges and attorney's fees.[40] Even so, the undisputed amount owed by BCR exceeds $3,000,000.00, according to CIT.

The Court rejects CIT's calculation because it does not include the proceeds from the sale of the Equipment. Although ¶ 15.2 of the CIT Lease allows CIT to retain any surplus from the proceeds of the sale of equipment, it does not mention proceeds from the letters of credit. CIT admits that it has collected approximately $4,471,844.50 in payment of BCR's debt under the CIT Lease, which is more than the undisputed amount owed by BCR. The sales proceeds, when combined with the

---

40. *See supra* note 20.

letters of credit, render CIT "made whole" and the rule inapplicable unless the additional amounts claimed by CIT are included in the calculation. Whether the "made-whole" rule should apply to Rogers' and Williams' subrogation claim is an issue that this Court need not address because of their failure to show that CIT was unjustly enriched or that their equities are superior to CIT's.

### 4. Would Equitable Subrogation Prejudice Third Parties?

 As to CIT's second contention, it is an elementary principle of Mississippi law that subrogation is unavailable when the subrogation remedy sought by a party would result in "prejudice or injury" to the subrogor. *In re Shavers*, 418 B.R. 589, 605 (Bankr.S.D.Miss.2009) (citing *Lyon v. Colonial United States Mortg. Co.*, 129 Miss. 54, 91 So. 708, 709 (1922)). As the Fifth Circuit explained, application of subrogation "should not cause any disadvantage to the obligee." *Rabo Agrifinance*, 583 F.3d at 354; *see In re Guess*, No. 10–05006–NPO, 2010 WL 3733873, *7 (Bankr. S.D.Miss. Sept. 17, 2010) (denying equitable subrogation where it "would result in substantial harm to the unsecured creditors of the Debtor's bankruptcy estate").

 In making this determination, courts consider: (1) whether applying equitable subrogation will prevent unjust enrichment and (2) whether the party seeking equitable subrogation has clear equities that are superior to the competing equities of third parties who would be effected by the subrogation remedy. *BMW Fin. Servs. v. Bill Heard Enterprises, Inc. (In re Bill Heard Enterprises, Inc.)*, 423 B.R. 771, 787 (Bankr. N.D.Ala.2010). The first determination lies at the heart of the remedy of equitable subrogation. As the Fifth Circuit noted, it is "[t]hrough [subrogation that]

equity seeks to prevent the unearned enrichment of one party at the expense of another." *Compania*, 303 F.2d at 697 (citing 50 Am Jur. Subrogation 3, at 679).

The requirement of unjust enrichment remains unchanged by the revisions to Article 5. Section 5–117 does not grant subrogation as a matter of course but only "to the same extent as if the (party) were a secondary obligor." As explained in *In re Mayan Networks Corporations*:

Subrogation under Section 5–117 is derivative of suretyship law and leaves intact the engine of subrogation in that law: unjust enrichment. Subrogation, a creature of equity, is a remedy. It redresses the unfairness of unjust enrichment. Without unjust enrichment, subrogation is a loose remedy that can upset after the fact risk that mature commercial parties have allocated before the fact. To give parties a subrogation remedy without first finding unjust enrichment is to invest courts with the power to undo at their whim commercial relationships that private contracting parties have arranged.

*Mayan*, 306 B.R. 295, 309 (9th Cir. BAP 2004). It is for this reason that equitable subrogation may not apply in the letter of credit context, even when it is available under § 5–117. Although there is almost always enrichment in letter of credit transactions, as there is in most commercial transactions, *unjust* enrichment is often absent. For this reason, some scholars consider letter of credit transactions generally unsuitable for the subrogation remedy. John F. Dolan, *A Study of Subrogation Mostly in Letter of Credit and Other Abstract Obligation Transactions*, 64 Mo. L. Rev. 789, 801 (Fall 1999). As one court observed, "[t]he case law emphasizes that the parties to the letter of credit are, more often than not, sophisticated parties." *Barclay's Bank PLC v. Dresdner Bank*

*Lateinamerika A.G. (In re Lancaster Steel Co.)*, 284 B.R. 152, 161 (S.D.Fla.2002). This last fact renders letter of credit applicants "poor candidates for the remedy" of equitable subrogation. Dolan, *A Study of Subrogation*, 64 Mo. L. Rev. at 833.

■ As mentioned previously, the second determination is related to the unjust enrichment requirement. As set forth by the Fifth Circuit, it requires that "the equity of the party seeking subrogation ... be strong and his rights clear, and his equity ... be superior to that of other claimants." *Compania*, 303 F.2d at 697. If there are greater, or "countervailing equities" of other parties whom will be effected by subrogation, subrogation is defeated. This outcome is due to the "superior equities doctrine," where "[t]he burden is upon the one seeking subrogation to establish its superior equity." *In re Flamingo 55, Inc.*, 378 B.R. 893, 917 (Bankr. D.Nev.2007); *see Bank of Oxford*, 16 So.2d at 390 (the doctrine of subrogation "will never be enforced when the equities are equal").

■ This analysis is performed from the perspective of what the party seeking subrogation could have done differently. *Heard*, 423 B.R. at 787. Parties who are present at the outset of the underlying transaction, such as letter of credit applicants, almost always have the ability to bargain for better protection for themselves or to arrange a different financing structure or to decline to participate altogether in the deal. As one court asserted, "[h]aving failed to protect itself, equity will not now come to its rescue." *Flamingo 55*, 378 B.R. at 917. Unjust enrichment is not present where the deal played out as it was intended, although someone is left disappointed, particularly where the party seeking subrogation came to fill his role in the deal with the intent to serve his own interests. For example, in *Lancaster Steel*

*Co.*, 284 B.R. at 161, the court "declined to use equity to grant rights to [a letter of credit] issuer where the issuer could have contracted for those rights."

> [The plaintiff] could have included language that limited the amount of funds available under the letter of credit, or specified that [the beneficiary] could only draw an amount that it reasonably knew was needed to secure performance by [the debtor], or contracted for additional collateral. It did none of these things.

*Id.*

Parties do not arbitrarily choose the letter of credit transaction as opposed to guarantees and contracts of suretyship. The choice is made based on the needs of the parties in the particular transaction. It is not unjust to leave sophisticated parties to the bargain they made.

■ Rogers and Williams were involved at the outset of the Sale/Leaseback Transaction. They could have had rights reserved to them in the CIT Lease. They entered this transaction to serve their own interests, and although they are disappointed by an insolvent BCR, this was a risk that these former owners of BCR freely accepted. When BCR defaulted on its obligations under the CIT Lease, the risk fell where the Sale/Leaseback Transaction meant for it to fall.

As mentioned in the beginning, when BCR defaulted, CIT turned to the issuers of the letters of credit and drew the maximum amount available, the issuers turned to Rogers and Williams for reimbursement. When Rogers and Williams turned back to seek reimbursement from BCR, they were met with BCR's insolvency. Certainly, Rogers and Williams were disappointed, but they had their own interests in causing the letters of credit to issue, and they cannot be heard to com-

plain now that they believe the result is inequitable when that is what they bargained for. If Russia had not banned chicken imports and if the poultry industry had not declined so far, BCR may have been able to pay the CIT Lease, and Rogers and Williams would have been content, enjoying the benefits of having made a wise decision. Being disappointed by how the events unfolded, Rogers and Williams cannot undo the bargain they made. Equitable subrogation under these facts would dramatically change the allocation of risk the parties accepted when they entered into the Sale/Leaseback Transaction. There is no unjust enrichment here, and application of the remedy would not do any equity, but would undo it, and "[s]ubrogation as an equitable weapon may not thus be corrupted." *Compania,* 303 F.2d at 699.

Because Rogers and Williams cannot satisfy all of the common-law elements for subrogation, they cannot asset claims against CIT arising out of its alleged breach of the CIT Lease. As discussed above, they have not shown that their equities are superior to CIT's.

## D. Unjust Enrichment

Rogers and Williams allege that CIT's retention of the proceeds from their letters of credit results in CIT's unjust enrichment. They seek restitution in the amount of $3,000,000.00, plus interest.

 The doctrine of unjust enrichment "is based on a promise, which is implied in law, that one will pay a person what he is entitled to according to 'equity and good conscience'." *1704 21st Avenue, Ltd. v. City of Gulfport,* 988 So.2d 412, 415 (Miss.Ct.App.2008). To succeed in an unjust enrichment action, "the claimant must show 'there is no legal contract but . . . the person sought to be charged is in possession of money or property which in good

conscience and justice he should not retain, but should deliver to another.'" *Johnston v. Palmer,* 963 So.2d 586, 596 (Miss.Ct. App.2007) (quoting *Estate of Johnson v. Adkins,* 513 So.2d 922 (Miss.1987)).

1. **Are Rogers' and Williams' Unjust Enrichment Claims Precluded by the Existence of Express Contracts?**

 CIT points out as a preliminary matter that "[t]o collect under an unjust enrichment or quasi-contract theory, the claimant must show 'there is no legal contract. . . .'" *Ellis v. Anderson Tully Co.,* 727 So.2d 716, 719 (Miss.1998). CIT insists that there are two legal contracts here that preclude any claim for unjust enrichment by Rogers and Williams, namely the Loan Agreement and the CIT Lease. According to CIT, Rogers and Williams must look to these contracts as the sole measure of their rights. *See Johnston,* 963 So.2d at 596–97 (holding that damages based on unjust enrichment are not an appropriate remedy when an agreement sets forth terms of compensation).

As CIT itself has repeatedly noted in defense of Rogers and Williams' breach of contract claims, there is no privity of contract between CIT and Rogers and Williams. The Loan Agreement is a contract between Rogers and Williams and BCR, and the CIT Lease is a contract between BCR and CIT. These contracts do not cover the same subject matter as Rogers and Williams' unjust enrichment claim against CIT. Rogers and Williams are not precluded from asserting unjust enrichment because of the existence of an express contract.

2. **Does Unjust Enrichment Constitute a Separate Cause of Action Under Mississippi Law?**

It is worth mentioning, although it was not addressed at length in any of the post-

trial briefs, that there is conflicting case authority about whether unjust enrichment constitutes an independent basis of liability under Mississippi law. The federal district court in *Coleman v. Conseco, Inc.*, 238 F.Supp.2d 804, 813 (S.D.Miss.2002), *partially abrogated on other grounds by Sweeney v. Sherwin Williams Co.*, 304 F.Supp.2d 868 (S.D.Miss.2004), concluded that unjust enrichment is a measure of damages, not a separate cause of action.

> Regarding Plaintiffs' unjust enrichment claim, "[t]he phrase *unjust enrichment does not describe a theory of recovery*, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." 66 Am. Jur. 2d RESTITUTION AND IMPLIED CONTRACTS § 9 (2002) (emphasis added). Plaintiffs have cited no case law establishing "unjust enrichment" as an independent compensable tort, and the Court is aware of none.

*Coleman*, 238 F.Supp.2d at 813. More recently, the federal district court in *Cole v. Chevron USA, Inc.*, 554 F.Supp.2d 655, 673 (S.D.Miss.2007), cited *Coleman* in reaching this same conclusion. *See Prism Marketing Co. v. Casino Factory Shoppes, LLC*, No. 2:08CV163–SA–SAA, 2009 WL 4348952 (N.D.Miss. Nov. 30, 2009) (unjust enrichment claim requires proof of some legally cognizable wrong).

On the other hand, there is a large body of Mississippi case law that treats unjust enrichment as encompassing its own cause of action. For example, in *Koval v. Koval*, 576 So.2d 134 (Miss.1991), the Mississippi Supreme Court described the theory as follows:

> The doctrine of unjust enrichment ... applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another, the courts imposing a duty to refund the money or the use value of the property to the person to whom in good conscience it ought to belong.

*Koval*, 576 So.2d at 136; *see also Blades v. Countrywide Home Loans, Inc.*, No. 1:06CV 1000–LG–JMR, 2007 WL 2746678 (S.D.Miss. Sept. 18, 2007) (Mississippi courts recognize existence of an unjust enrichment theory of recovery). It is unnecessary for this Court to determine whether unjust enrichment is a distinct cause of action because Rogers and Williams have failed to prove the elements of such a claim for the same reason that they failed to prove their claim for equitable subrogation. Those reasons are discussed below.

### 3. Was CIT Unjustly Enriched?

██ To prevail on their equitable claim of unjust enrichment, Rogers and Williams contend that they need only show that CIT is in possession of funds belonging to them that as a matter of good conscience and justice CIT should not retain. *See Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 342 (Miss.2004). In support of their claim, they assert that they sustained a loss when they each reimbursed the issuers for the amounts paid CIT under the letters of credit and that their loss of $3,000,000.00 was proportionate to CIT's gain.

██ Indeed, the evidence at Trial established CIT's enrichment, a broad concept in an unjust enrichment action. "A person is enriched when he receives an economic benefit. This includes positive profits, a loss avoided, as well as discharge of debts." *Omnibank of Mantee*, 607 So.2d at 92. The evidence also showed a direct relationship between CIT's enrichment and Rogers and Williams' impoverishment. Nevertheless, an unjust enrich-

ment claim requires more. Rogers and Williams must also prove that CIT's retention of the benefit was unjustified. It is the absence of such evidence that defeats Rogers and Williams' claim. The definition of "unjust enrichment" infers a situation "where it would be contrary to equity and good conscience for an individual to retain a property interest acquired at the expense of another." *Dudley v. Light,* 586 So.2d 155, 159 (Miss.1991). Here, however, CIT's retention of the proceeds from the letters of credit was justified because it was consistent with the terms of the CIT Lease. "[T]he mere fact just debts owed [CIT] may have been paid, without more, does not make its enrichment unjust." *Omnibank of Mantee v. United Southern Bank,* 607 So.2d 76, 92 (Miss.1992). CIT's contention that the Loan Agreement and CIT Lease governed Rogers and Williams' rights and thus precluded any recovery is a clumsy attempt to make this same point. It is worth noting as an aside that Rogers and Williams had the opportunity to outbid Koch, purchase the Equipment, and dispose of it as they saw fit, if they believed the proposed sale to Koch was commercially unreasonable, but they chose not to do so. For reasons different from those asserted by CIT, however, the Court reaches the conclusion urged by CIT, that Rogers and Williams must look to BCR alone to recoup their losses. Although CIT was enriched, it was not enriched unjustly.

## CONCLUSION

In conclusion, as seasoned businessmen and former owners of BCR, Rogers and Williams understood the risk they undertook when they agreed to provide the letters of credit as part of the refinancing plan required by the Senior Lenders. At the time, the risk was acceptable to them. Although BCR did not recover from its financial struggles, as Rogers and Williams had expected, their financial loss was not anyone's fault but the result of a confluence of events and decisions, any one of which was perhaps insignificant by itself but together proved insurmountable to BCR's financial health.

Based on the foregoing, the Court finds that the relief requested in the *Second Amended Complaint* is not well taken and should be denied. A separate final judgment consistent with this opinion will be entered in accordance with Federal Rules of Bankruptcy Procedure 7054 and 9021.